

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-2001

# TKR Cable Co v. Cable Cty Corp

Precedential or Non-Precedential:

Docket 98-5341

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"TKR Cable Co v. Cable Cty Corp" (2001). *2001 Decisions.* Paper 224.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/224

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5341

TKR CABLE COMPANY

v.

CABLE CITY CORPORATION; JAY GRABERT;
CHRIS SCHAD; JOHN DOES 1-10;
JANE DOES, 1-10; UNIDENTIFIED CORPORATIONS 1-10;
UNIDENTIFIED BUSINESS ENTITIES 1-10; MADELAINE
MURPHY; KENNY JOHNSON; ONE STEP AHEAD, INC.,

       Cable City, Inc.,
       Jay Grabert and Chris Schad,
       Appellants

On Appeal from the United States District Court
for the District of New Jersey
District Judge Garrett E. Brown, Jr.

Argued April 17, 2001

Before: ALITO, RENDELL, and FUENTES, Circuit  Judges

(Opinion Filed: October 1, 2001)

       Eugene P. Franchino (argued)
       3 Mills Court
       Flemington, New Jersey 08822

        Attorney for Appellants

        Patrick J. Sullivan (argued)
        Daniel J. Lefkowitz
        Lefkowitz, Louis and Sullivan
        350 Jericho Turnpike, Suite 300
        Jericho, New York 11753

         Attorneys for Appellee

OPINION OF THE COURT

FUENTES, Circuit Judge.

TKR Cable Company ("TKR") brought this action against sellers of cable television descramblers, seeking statutory damages and injunctive relief for alleged violations of 47 U.S.C. SS 553 and 605. On cross-motions for summary judgment, the District Court determined, among other things, that (1) the defendants had conducted 16 sales of cable descramblers in violation of SS 553 and 605, and (2) through these sales, the defendants had assisted in the interception of radio communications and therefore were subject to the more severe statutory penalties ofS 605, rather than the relatively lenient penalties ofS 553. After an evidentiary hearing on damages, the court imposed the minimum damages pursuant to S 605 of $10,000 per device, for a total of $160,000. The court also awarded counsel fees and granted injunctive relief.

The issue on appeal is whether S 605, which prohibits the unauthorized interception of radio communications, applies to the sale of cable decoding equipment. The defendant sellers, Cable City Corporation and its officers Jay Grabert and Chris Schad (collectively "Cable City"), argue that S 553 is the sole statutory remedy for cable piracy of signals sent over terrestrial cable lines, and that S 605 applies only against offenders who directly intercept satellite or radio broadcasts as they pass through open air.

We hold that a cable television descrambler does not facilitate the interception of "communications by radio" and therefore the statutory damages available underS 605 do not apply here. Accordingly, we will vacate the penalties imposed and remand the case for further proceedings.

2

I

TKR, based in Piscataway, New Jersey, provides cable television services under the authority of various municipal franchises it has purchased. These franchises authorize TKR to construct, operate, and maintain cable television systems in parts of Middlesex, Monmouth, and Somerset counties. TKR offers its subscribers programming in packages, which include Basic and Standard services, as well as the option to elect premium programming services, such as Cinemax, Home Box Office ("HBO"), and Showtime, each at an additional monthly charge. TKR also offers Pay-Per-View programming, providing subscribers the opportunity to purchase individual movies, sporting events, or other entertainment at a per event fee. TKR transmits the signals for all of its cable television services from its reception facilities in Piscataway to the homes of subscribers through a network of cable wiring and equipment. To prevent subscribers from receiving services they have not purchased, TKR encodes the signals, providing paying subscribers with a decoder that deciphers transmissions for the appropriate channels. Scrambling constitutes the primary means by which TKR, as well as most cable service providers, prevent theft of their transmissions.

In spite of TKR's precautions, the cable theft business persists. Cable pirates have permeated the marketplace with unauthorized decoders that render viewable previously scrambled transmissions. In most cases, TKR cannot detect or prevent the theft of its programming services without permission from a subscriber to inspect his or her home.

Cable City conducted a cable piracy operation out of an office in Matawan, New Jersey. Specifically, Cable City sold cable television decoders to the public, offering descrambling services to the region for a profit. Cable City represented to customers that its descramblers were "bullet protected" or "bullet proof," meaning that they could circumvent TKR's electronic security measures designed to disable pirate decoders. Cable City advertised and marketed its illicit wares to TKR's subscribers via "Val-Pak" direct mailings, promoting their descramblers as devices designed for use on TKR's cable television system.

TKR initially noticed Cable City's activities in or around April 1996 when some of its employees received these Val-Pak mailings. The advertisements stated that Cable City sold cable television decoders, remarking in smaller print, "Anyone implying theft of cable services will be denied a sale." The mailings further stated in yet smaller print, "It Is Not The Intent Of Cable City To Defraud Any Pay Television Operator And We Will Not Assist Any Company Or Individual In Doing The Same." In response to these developments, TKR retained a private investigator who visited Cable City's office and later purchased a descrambler based upon the representation of a Cable City sales agent that the device would "get" all of the premium and Pay-Per-View channels. During testing at TKR's facility, the descrambler received and permitted viewing of all of TKR's scrambled programming services, including premium and Pay-Per-View programming.

On June 14, 1996, TKR sought and obtained an ex parte temporary restraining order from the District Court, enjoining Cable City from further sales of cable television descramblers. The order further froze the defendants' business and personal assets and granted expedited discovery. The order additionally authorized the seizure of cable television descramblers, business records, and the proceeds of descrambler sales.

After a hearing on June 27, 1996, the court issued an order entering a preliminary injunction: (1) enjoining the continued sale or marketing of decoders; (2) enjoining the alteration, removal, or destruction of any business records concerning transactions involving decoders; (3) enjoining the transfer, withdrawal, or encumbrance of any assets without a showing that such action would be necessary for personal expenses or legitimate business expenses; (4) reaffirming the prior grant of expedited discovery; and (5) imposing upon the defendants a duty to notify TKR of their subsequent obtainment of any of the above items (i.e., cable decoders, business records, illicit proceeds) and to retain such items pending a further order of the court. See TKR Cable Co. v. Cable City Corp., No. 96-2877(GEB), 1996 WL 465508, at *12 (D.N.J. July 29, 1996).

4

Following discovery, the parties filed cross-motions for summary judgment. On January 27, 1998, the District Court granted TKR's motion for summary judgment as to all but one defendant, holding Cable City liable under both 47 U.S.C. SS 553 and 605. The District Court also entered a permanent injunction prohibiting Cable City "from selling or otherwise distributing any equipment intended for unauthorized reception of any communication service offered over [TKR's] cable system." TKR Cable Co. v. Cable City Corp., No. 96-2877(GEB), slip op. at 11, 13 (D.N.J. Jan. 27, 1998); see also 47 U.S.C. S 553 (1991 & Supp. 2001); 47 U.S.C. S 605 (1991 & Supp. 2001). The court denied Cable City's cross-motion for summary judgment. Id. The District Court determined that S 605(a) applies to Cable City's conduct, stating that "the prohibition contained in section 605(a) against the unauthorized interception of `radio communications' has also been interpreted to include cable television transmissions." Id. at 4 (quoting TKR Cable Co. v. Cable City Corp., 1996 WL 465508, at *6). Following a subsequent hearing on damages, the District Court issued a memorandum opinion, finding that Cable City had made 16 decoder sales. See TKR Cable Co. v. Cable City Corp., No. 96-2877(GEB), slip op. at 5-6 (D.N.J. June 11, 1998). In accordance with S 605, the court assessed statutory damages of $10,000 per violation, amounting to a total damage award of $160,000, plus attorneys' fees and costs of $96,514.33. Id .; see also TKR Cable Co. v. Cable City Corp., No. 96-2877(GEB), slip op. at 2 (D.N.J. Jan. 25, 1999). Cable City filed this appeal.

The District Court exercised jurisdiction pursuant to 28 U.S.C. S 1331. We have jurisdiction under 28 U.S.C. S 1291. With respect to the District Court's decision to enter a temporary restraining order and a preliminary injunction freezing the defendants' assets, we review the District Court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant injunctive relief for an abuse of discretion. Maldonado v. Houstoun, 157 F.3d 179, 183 (3d Cir. 1998). Regarding the District Court's decision to grant summary judgment to TKR, our review is plenary. Pennsylvania Ass'n of Edwards Heirs v. Rightenour, 235 F.3d 839, 841 (3rd Cir. 2000). Summary judgment is appropriate where the record, viewed

in the light most favorable to the non-moving party, shows
that there is no genuine issue of material fact and that the
moving party is entitled to summary judgment as a matter
of law. Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir.
2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-
50 (1986)).

II

Cable City's principal argument is that the District Court
erred in subjecting it to the exacting liability provisions of
S 605, rather than assessing liability under the milder
provisions of S 553.1 Section 605 subjects Cable City to a

_____

1. Section 605 provides in relevant part:

(a) . . . No person not being authorized by the sender shall intercept
any radio communication and divulge or publish the existence, contents,
substance, purport, effect, or meaning of such intercepted
communication to any person. No person not being entitled thereto shall
receive or assist in receiving any interstate or foreign communication by
radio and use such communication (or any information therein
contained) for his own benefit or for the benefit of another not entitled
thereto. . . .

(e)(3)(C)(i)(II) [T]he party aggrieved may recover an award of statutory
damages . . . for each violation of paragraph (4) of this subsection
involved in the action an aggrieved party may recover statutory damages
in a sum not less than $10,000, or more than $100,000, as the court
considers just.

(e)(4) Any person who manufactures, assembles, modifies, imports,
exports, sells, or distributes any electronic, mechanical, or other device
or equipment, knowing or having reason to know that the device or
equipment is primarily of assistance in the unauthorized decryption of
satellite cable programming, or direct-to-home satellite services, or is
intended for any other activity prohibited by subsection (a) of this
section, shall be fined not more than $500,000 for each violation, or
imprisoned for not more than 5 years for each violation, or both. . . .

Section 553 provides in relevant part:

(a)(1) No person shall intercept or receive or assist in intercepting or
receiving any communications service offered over a cable system, unless
specifically authorized to do so by a cable operator or as may otherwise
be specifically authorized by law.

6

minimum liability of $10,000 in damages for each of its sixteen decoder box sales, amounting to damages of no less than $160,000. Section 553, by contrast, provides a statutory damages range of $250 to $10,000 and increases the range by an additional $50,000 for violations committed "willfully and for purposes of commercial advantage or private financial gain." Cable City maintains that Congress provided liability in S 605 for cable pirates who directly intercept airborne transmissions but not for offenders like Cable City who sell decoder boxes that intercept cable transmissions. TKR contends that S 605 applies because Cable City's actions constitute interception or unauthorized reception of radio communications. We agree with Cable City.

A

We begin by recounting the historical background underlying S 605. Although S 605 originally addressed wire communications, such as those with which Cable City interfered, Congress subsequently revised the section in 1968, confining its scope nearly exclusively to radio transmissions. This statutory alteration proves critical to our analysis.

Section 605 has its genesis in the beginning of the twentieth century with the enactment, in 1912, of the "Act to Regulate Radio Communication." Act of Aug. 13, 1912,

_____

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

(c)(3)(A)(ii) [T]he party aggrieved may recover an award of statutory damages for all violations involved in this action, in a sum of not less than $250 or more than $10,000 as the court considers just.

(B) In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages . . . by an amount of not more than $50,000.

7

ch. 287, 37 Stat. 302. This act, originally intended to protect the confidentiality of wireless ship-to-shore communications, defined "radio communications" as "any system of electrical communication by telegraphy or telephony without the aid of any wire connecting the points from and at which the . . . signals . . . are sent or received." Id. S 6, 37 Stat. at 308 (emphasis added). Congress replaced the 1912 Act with the Radio Act of 1927. Radio Act of 1927, ch. 169, 44 Stat. 1162. This measure included a definition of radio communication as being "any. . . communication of any nature transferred by electrical energy from one point to another without the aid of any wire connecting the points from and at which the electrical energy is sent or received . . . ." Id.S 31, 44 Stat. at 1173 (emphasis added). These definitions clearly show Congress' desire, from the beginning of the twentieth century, to distinguish between radio communications and communications transmitted over wire.

Seven years later, Congress repealed the Radio Act of 1927 when it passed the Communications Act of 1934 (the "Communications Act" or the "1934 Act"), now codified in relevant part at 47 U.S.C. S 605(a). Communications Act of 1934, ch. 652, 48 Stat. 1064. This act established the Federal Communications Commission and granted it jurisdiction over the regulation of radio and wire transmissions. Id. The Communications Act originally provided for the maintenance of privacy through four clauses that prohibited: (1) the unauthorized divulgence or publishing of wire or radio communications by the operators responsible for receiving such communication; (2) the unauthorized interception and divulgence of wire or radio communications; (3) the unauthorized receipt and use of wire or radio communications for the benefit of the unauthorized receiver or someone else not entitled to the communication; and (4) the divulgence, publication, or use of unlawfully intercepted information by anyone knowing that the information was wrongfully obtained. See id. at 1103-04 (codified as amended at 47 U.S.C. S 605(a)). The 1934 Act further provided definitions of wire and radio communication that are still in use today and are codified at 47 U.S.C. S 153. Specifically, S 153 defines radio and wire communication as follows:

8

(33) The term radio communication or "communication by radio" means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission. . . .

(52) The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. S 153(33), (52) (2001). Accordingly, in both the principal provisions of the Communications Act, now codified at 47 U.S.C. S 605, and the definitional provisions now codified at S 153(52) and S 153(33), Congress clearly defined wire and radio communications as concepts involving distinct types of transmissions.

Thirty-four years after passage of the Communications Act, Congress restructured the regulatory framework governing the interception of radio and wire communications when it passed the Omnibus Crime Control and Safe Streets Act of 1968. See Pub. L. No. 90-351, 82 Stat. 197 (the "Crime Control Act" or the "1968 Act"). Seeking to combat a contemporary surge in crime, particularly in organized activity, Congress greatly expanded the authority of law enforcement officials to monitor the communications of suspected offenders. To ensure autonomy and coherence in the novel framework of the 1968 Act, Congress amended S 605 from the Communications Act to remove references to wire communications from all but the first clause ofS 605(a), which banned the divulgence of wire and radio transmissions by communications personnel. See 1968 Act, 82 Stat. at 223. The legislative history of the 1968 Act states that, while the act removed prohibitions on interference with, and monitoring of, wire communication

9

from the purview of section 605 of the Communications Act, Congress introduced comprehensive provisions regulating the interception of wire and oral communications, now codified at 18 U.S.C. S 2510 et seq. See S. Rep. No. 1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2196-97. Congress also explained why it removed the reference to wire communication in S 605:

> This section amends section 605 of the Communications Act of 1934 (48 Stat. 1103, 47 U.S.C. sec. 605 (1958)). This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code.

Id. (emphasis added) Thus, through the Crime Control Act, Congress removed from S 605 of the Communications Act the principal share of its authority over wire communications, leaving S 605 primarily with radio communications. In short, although S 605, as originally drafted in 1934, would have reached the cable decoder box piracy perpetrated by Cable City, the 1968 Act removed the critical language granting S 605 authority over such conduct.[2]

TKR contends nonetheless that, in spite of the Crime Control Act, S 605 continues to cover cable transmissions. TKR asserts that, although the 1968 Act removed key references to "wire communications" from S 605, the remaining references to "radio communication" in the Act suffice to encompass the acts of Cable City in the instant case. In particular, TKR argues that the definition of "[r]adio communication" in S 153(33) supports a

_____

2. It is undisputed that the Crime Control Act itself does not cover Cable City's actions. Congress, in 18 U.S.C. S 2510(1), restricted the scope of wire communications to those aural communications transmitted via wire or cable operated by a common carrier. Because, in 1968, the Supreme Court determined that cable television distributors do not qualify as common carriers, 18 U.S.C. S 2510(1) does not reach cable television transmissions. See United States v. Southwestern Cable Co., 392 U.S. 157, 169 n.29 (1968). The 1968 Act therefore does not address the defendants' conduct.

determination that all wire communications, be they of wire, radio, or satellite origin, fall under S 605. TKR notes that the provision defining "[r]adio communication" in S 153(33) includes within its scope "the transmission by radio of [communication] of all kinds, including all instrumentalities, facilities, apparatus and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. S 153(33). TKR thereby suggests that all wire retransmissions after the receipt of a radio transmission necessarily fall within the definition of S 153(33) because they entail the conveyance of a radio signal via "instrumentalities [or] facilities . . . incidental to such communication." Id.

We reject TKR's interpretation of S 153(33) because, as the Seventh Circuit noted in United States v. Norris, "if the . . . argument is taken to its full conclusion, it .. . unacceptably blurs the line between radio and wire communications." United States v. Norris, 88 F.3d 462, 467 (7th Cir. 1996). We believe that such an expansive construction of "radio communication" would place an unacceptably broad range of transmissions within the purview of S 605, effectively ignoring the significance of Congress' excision of "wire communication" from S 605. As the Norris court noted, this reading of "radio communication" would place cordless telephone conversations within the ambit of S 605 because they commence with a brief radio communication, followed by an extensive wire transmission. Moreover, TKR's reading of S 153(33) demands undue contortion of the phrase "instrumentalities [or] facilities . . . incidental to such transmission." Suggesting that an entire cable infrastructure constitutes a mere instrumentality incidental to the transmission of a satellite broadcast ignores the scale of effort entailed in delivering this transmission to a given residence. The wires that connect a home satellite dish to the living room television arguably constitute facilities incidental to the transmission. However, the entire cable transmission infrastructure of a city or suburban area, a structure that provides a foundation for a significant business, such as that of TKR, or any other major cable service provider, cannot be considered a mere

11

instrumentality to transmission. The plain language of S 153(33), read in the context of the Crime Control Act, therefore precludes an interpretation of "radio communication" in S 153(33) that would include terrestrial cable transmissions such as those in the instant case.

In sum, by transferring authority over wire communications to the province of the Crime Control Act, Congress removed coverage of wire communications from S 605, and thereby excluded activities such as Cable City's from that provision's scope. Moreover, contrary to TKR's argument, because TKR's cable transmissions are not "incidental" to the transmission of radio communications, the S 153(33) definition of radio communications that accompanies S 605 does not apply here. We believe, therefore, that S 605 does not reach Cable City's conduct.

B

Even if there were any doubt as to the facial applicability of S 605, the history of both SS 605 and 553 and Congress' express intent demonstrates that only S 553, and not S 605, applies to Cable City's conduct. Two principal reasons, both particularly informed by a historical perspective, demonstrate why only S 553, rather than S 605, reaches Cable City's conduct: (1) in 1984, Congress enactedS 553 to combat the novel phenomenon of cable piracy, a crime that acquired significance only with the recent expansion of the cable industry in the 1970s; and (2) an interpretation of S 605 that reaches Cable City's conduct would effectively render S 553 superfluous because it would deprive S 553 of any substantial activity that it could uniquely address.

We begin by setting S 553 within the context of cable industry history. In the years following the passage of the 1968 Omnibus Crime Control Act, the cable television industry witnessed a period of widespread and unprecedented expansion. Although cable television, which found "its beginnings as a means of providing the residents of rural areas with better reception of over-the-air television broadcast signals," spread from its inception quickly beyond its non-commercial roots in 1949 Oregon, it had still, by the mid-1970s, reached "no more than 12 to 15

12

percent of American homes." H.R. Rep. No. 98-934, at 20-21 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, at 4657-58. The year 1975, however, brought significant change, particularly through the introduction of satellite technology, which Congress, in its legislative history to 47 U.S.C. S 553, later documented:

> The cable industry has changed dramatically since its beginnings . . . .
>
> In 1975, Home Box Office (HBO), a Time, Inc. subsidiary, revolutionized the cable industry by launching the satellite delivery of its programming service. This development made it possible to economically deliver to local cable systems by satellite a vast array of national programming services. These new services provided movies, sports, news, and specialized programming directed to a number of individual segments of the national audience such as children, minorities and senior citizens. With the availability of these new services, the cable television industry experienced a new round of growth and expansion, moving into still larger cities with systems that promised over 100 channels to every home.

Id. Addressing this sudden growth of the cable industry and its accompanying consequences, Congress in 1984 promulgated the Cable Communications Policy Act, a new regulatory framework for the field of cable television. See Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 (codified in relevant part at 47 U.S.C. S 553) ("Cable Act" or "1984 Act").

As part of the 1984 Act, Congress passed what is now 47 U.S.C. S 553(a), which provides, among other things:

> (1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
>
> (2) For purposes of this section, the term "assist in intercepting or receiving" shall include the

13

manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. S 553(a). Through these provisions of the Cable Act, Congress acknowledged the novel expansion of the cable television industry, and created strict new penalties to deter cable pirates who would otherwise exploit this phenomenon.

As we noted above, Congress enacted S 553 specifically to combat the novel phenomenon of cable piracy, a crime that emerged in abundance only with the cable industry developments of the 1970s. The legislative history to the Cable Act supports this interpretation. Congress therein expressly identified the threat to the rapidly changing cable industry that the newly enacted S 553 would address:

> The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service. This problem has taken on many forms from the manufacture and sale of equipment intended to permit reception of cable services without paying for it, to apartment building dwellers "tapping" into cable system wire in a building's hallway that is used for providing service to a neighbor's apartment unit, to the sale by building superintendents of cable converters left behind by previous tenants to new tenants. Such practices not only often permit one to obtain cable service without paying the installation and hook-up costs, but also, for instance, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services.

> Theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits

14

> that other individuals are getting by receiving cable
> service without paying for it.

H.R. Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N. at 4720. It is clear, from the language of the statement above, that Congress sought primarily to address the phenomena associated with the recent accelerated growth of the cable industry, fueled by the "satellite delivery of . . . programming service." Id. at 4658. Without this "development [which] made it possible to economically deliver to local cable systems by satellite a vast array of national programming services," there would have been neither a greatly expanded cable industry, the greatly expanded cable piracy that accompanied it, nor the necessity to pass legislation regulating either the former or the latter. Id. These concerns all strongly suggest that, in enacting S 553 as part of the Cable Communications Policy Act, Congress wished to address cable piracy in the most thriving and vital sector of the industry. That is, Congress intended to regulate the sector wherein cable networks "economically deliver to local cable systems by satellite a vast array of national programming services"-- the sector that had driven the unprecedented growth of the prior decade. Id.

TKR argues, however, that S 605 already addressed this growing field of cable piracy. We reject TKR's interpretation, not only because the legislative history accompanying S 553 demonstrates that Congress drafted the provision to deter the newly emergent and previously unaddressed cable piracy, but also because TKR's reading of S 605 would effectively render S 553 superfluous.

To avoid suggesting that S 553 is redundant, TKR contends that Congress actually drafted S 553 to provide liability for interception of communications directed from a point of origin to a particular destination solely by wire transmissions, a form of transmission that S 605 undisputedly has not addressed since the passage of the 1968 Act. Both history and the plain language of the statutes, however, expose the flaws in this conception of the regulatory framework. By suggesting that Congress drafted S 553 because it was primarily concerned with purely wire-bound cable transmissions, TKR proposes that

15

Congress conceived S 553 to address only local cable programming, a relatively minor segment of the industry. This argument ignores Congress' acknowledgment, recounted above, that the satellite technology and market forces reshaping the cable industry motivated its passage of the Cable Act. See, H.R. Rep. No. 98-934, at 19, reprinted in 1984 U.S.C.C.A.N. at 4656 (explaining that new legislation was necessary since "[t]he Communications Act of 1934 . . . was enacted well before the advent of cable television").

The legislative history to S 553 shows that Congress specifically designed the provision to combat decoder box piracy of satellite-delivered cable services. In describing the ills of decoder boxes, Congress explained that "[s]uch [cable piracy] practices not only often permit one to obtain cable service without paying the installation and hook-up costs, but also, for instance, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services." H.R. Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N. at 4720. This access to "premium movie and sports channels" that Congress described necessarily entails satellite transmitted broadcasts, as such access was a largely novel phenomenon that arrived only with the advent of HBO. Indeed, Congress specifically ascribed to HBO's delivery "by satellite [of] a vast array of national programming services" the emergence of "new services [that] provided movies, sports, news, and specialized programming directed to a number of individual segments of the national audience." H.R. Rep. No. 98-934, at 21, reprinted in 1984 U.S.C.C.A.N. at 4658. In light of the legislative history and the substantial changes in the landscape of the cable industry that shortly preceded and certainly motivated the passage of the Cable Act, it is clear that Congress enactedS 553 primarily to address the vast array of satellite-initiated cable transmissions, rather than the obscure realm of ground-initiated transmissions.

Yet, TKR suggests that the latter interpretation ofS 553 is the one that we should adopt. TKR's reading ofS 553 must be correct or else its interpretation of S 605 renders S 553 unacceptably redundant. TKR maintains that S 605

16

prohibits any interception of a cable television transmission where that transmission can claim some satellite origin, regardless of whether the interception occurred only after the signal had proceeded long past the satellite transmission phase and deep into the cable system retransmission phase. This broad reading of S 605 would encompass all possible interceptions prohibited byS 553, except for interceptions of purely wire-bound, ground-initiated cable transmissions. To avoid castingS 553 as redundant, TKR suggests that Congress enacted S 553 with the primary purpose of filling this obscure niche of potential cable piracy prohibitions. Because it renders S 553 superfluous and runs contrary both to history and to Congress' express intent, we reject TKR's interpretation.

We believe that Congress clearly enacted S 553 with the primary purpose of addressing satellite-initiated cable transmissions. Congress created S 553 to address an enforcement gap created by the 1968 modification ofS 605, which rendered S 605 applicable only to satellite transmissions insofar as they are actual airborne transmissions. As this gap had been of minimal significance until the cable industry expansion, Congress could afford to overlook it during much of the interval leading up to the 1984 Act. By 1984, however, Congress decided that the need to deter decoder box piracy of satellite-initiated cable television transmissions had become sufficiently pressing to merit legislation. In sum, we believe that both the historical context of these statutes and the expressed intent of Congress support our reading of S 553 as the exclusive means of addressing the defendants' conduct.

C

Finally, TKR maintains that we sho uld follow International Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996), in which the Second Circuit read S 605 broadly to encompass all satellite-originated transmissions. In contrast to the Second Circuit, the Seventh Circuit, in Norris, adhered to an analysis resembling more closely the one we adopt here, concluding that "cable television programming transmitted over a cable network is not a `radio communication' as defined in S 153(b), and thus its

17

unlawful interception must be prosecuted under S 553(a) and not S 605."3 Norris, 88 F.3d at 469.

In Sykes, the Second Circuit emphasized a section of the committee report accompanying S 605, which stated as follows:

> Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. Nothing in [S 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.

H.R. Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N. at 4720. In analyzing this passage in the legislative history, the Sykes court stated, "Although the issue is not entirely free from doubt, the more likely reading of this legislative history is that in view of the uniform prior judicial interpretation of S 605 as applicable to the theft of cable service, the . . . passage in the above quotation was intended to make clear that S 605 would continue to be so applicable." Sykes, 75 F.3d at 132.

We disagree with the Sykes panel's conclusion because we believe it overlooked a key congressional distinction concerning the point of unauthorized reception. The legislative history nowhere suggests that Congress considered S 605 as applying after 1968 to wire retransmissions of radio communications. The same passage of the committee report in fact demonstrates that, when Congress passed the Cable Act, it viewed S 605 as a provision applicable only to radio transmissions, and not to the subsequent retransmission along cable lines:

> The Committee intends the phrase "service offered over a cable system" to limit the applicability of [S 553] to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which

_____

3. In 1996, Congress reorganized S 153. Sections 153(a) and (b) became, respectively, SS 153(52) and (33). See  Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 61.

18

are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

H.R. Rep. No. 98-934 at 83, reprinted in 1984 U.S.C.C.A.N. at 4720. This language makes clear Congress' view that S 605 is directed solely at radio transmissions "to the extent reception or interception occurs prior to or not in connection with" cable distribution, and thatS 553 applies to theft of all signals being transmitted over a cable system. The Sykes court, however, suggests that this passage should be interpreted as "establishing S 605's exclusive jurisdiction over the transmission of a television signal by radio prior to the transmission of that same signal by cable, rather than as barring the application of S 605 to the subsequent cable transmission of the signal." Sykes, 75 F.3d at 132.

As the Norris court noted, had Congress truly meant to apply S 605 both to airborne and cable transmissions, it could have included a sentence stating that communications initiated by air transmission, but which are subsequently distributed over a cable system, continue to be regulated under S 605. See Norris , 88 F.3d at 469. Because Congress did not implement such language and instead used the "to the extent" phrasing quoted above, the legislative history "cannot be reconciled with the conclusion that S 605 applies to the unlawful interception of cable television programming transmitted over a cable network." Id. The committee report therefore substantiates the view that S 605 does not render S 553 superfluous because S 605 does not create liability for the interception of cable system transmissions.

The Second Circuit in Sykes nevertheless suggested an answer to the redundancy concerns, stating:

> We note that this result does not lead to a complete overlap between the coverage of SS 605 and 553. Section 605 applies to a considerable body of radio transmissions to which S 553 is inapplicable, while

19

> S 553 applies to any transmissions via cable, whether
> or not they originate as radio transmissions.

Sykes, 75 F.3d at 133. The Sykes court accordingly concluded that S 553 avoids a "complete overlap" by applying to ground-initiated cable transmissions. As we explained, however, a thorough analysis of the circumstances surrounding the passage of the Cable Act and its legislative history shows that Congress could not have enacted S 553 with the primary purpose of filling an obscure niche in cable piracy enforcement. Congress' language clearly demonstrates that it created S 553 to combat significant, novel, and previously unaddressed threats to the continued growth of the cable industry. We cannot believe that Congress invoked the imagery of a criminal activity "increasingly plaguing the cable industry . . . that poses a major threat to the economic viability of cable operators and cable programmers" only then to enact an inconsequential gap filler for an area of law enforcement already well fortified.

We therefore conclude that S 605 encompasses the interception of satellite transmissions "to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system," and no more. H.R. Rep. No. 98-934, at 83, reprinted in 1984 U.S.C.C.A.N. at 4720. Once a satellite transmission reaches a cable system's wire distribution phase, it is subject to S 553 and is no longer within the purview of S 605. Cable City therefore is subject to the statutory damages set forth in S 553(c), rather than the damages imposed under S 605(e).

III

For the foregoing reasons, we will vacate the award of damages under 47 U.S.C. S 605, and we will remand the case for further proceedings consistent with this opinion. We will affirm the District Court's imposition of the injunction.4

---

4. We affirm the decision of the District Court with regard to the freezing of Cable City's assets. This Court has held that an asset freeze or similar

20

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit
_____

injunctive relief is appropriate where it will assist the District Court
in
preventing defendants from committing further violations of the
Communications Act. See General Instrument Corp. of Del. v. Nu-Tek
Elecs. & Mfg., Inc., 197 F.3d 83 (3d Cir. 1999). We stated in that case
that defendant's business " `essentially facilitated cable theft in
violation
of S 553. To stop such an operation is a primary purpose of the
injunction. . . . Likewise, . . . [ the defendant ] should not be allowed
to
use its remaining assets, which in all likelihood can serve only to
further
other cable theft enterprises.' . . . We see no abuse of discretion here.
. . ." Id. at 90-91 (quoting district court opinion with approval).
Similarly,
in this case, we find no abuse of discretion.

21