[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 30, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-11235

_____

D. C. Docket No. 02-61596-CV-WPD

AT&T BROADBAND,

Plaintiff-Appellee,

versus

TECH COMMUNICATIONS, INC.,
an active Florida corporation,
RICHARD MARMER,

Defendants-Appellants,

MR. BEVERAGE, DELI & MIDDLE
EASTERN DELIGHTS, INC., an
active Florida corporation,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 30, 2004)

Before BIRCH and WILSON, Circuit Judges, and DOWD[*], District Judge.

BIRCH, Circuit Judge:

This appeal presents an issue of first impression in this circuit: whether the Cable Communications Policy Act ("CCPA"), 47 U.S.C. § 553(c)(2)(A) (2001), empowers a district court to issue an ex parte order authorizing a freeze of assets or a search and seizure of property belonging to an alleged violator of the Act. After discovering that defendants-appellants[1] Richard Marmer and his company, Tech Communications, Inc. (collectively, "Marmer"), were selling "pirate" cable descramblers in violation of § 553(a)(1), plaintiff-appellee AT&T Broadband ("AT&T") filed suit against Marmer and sought an ex parte order freezing Marmer's assets and allowing AT&T to seize property related to its claims. The district court granted the order and we AFFIRM.

## I. BACKGROUND

AT&T contends that Marmer is involved in the sale of illegal cable descrambling devices that allow buyers to receive AT&T's cable television programming for free. AT&T filed suit[2] against Marmer alleging violation of §

---

[*]Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

[1]Mr. Beverage, Deli & Middle Eastern Delights, Inc. was dismissed as a defendant.

[2]AT&T requested, inter alia, a declaration proclaiming Marmer was violating 47 U.S.C. § 553(a)(1), an injunction prohibiting Marmer from distributing pirate cable decoders, damages

2

553(a)(1) of the CCPA, and, on the same day, filed an ex parte motion for, inter alia, an asset freeze and seizure of Marmer's business records.[3] See R1-1, 5. As evidence of Marmer's illegal activity, AT&T submitted the affidavits of two AT&T security personnel: (1) Craig Frappier, AT&T's Manager of Security and (2) Jeffrey Marin, an AT&T Security Investigator.

Frappier's affidavit detailed AT&T's lost revenue due to the sale of illegal cable descramblers. Specifically, Frappier explained that AT&T provides its subscribers with a "decoder" that unscrambles its television signals so that AT&T cable subscribers can receive AT&T's television signals. R1-11 at ¶ 8. The decoders are programmed to authorize viewing of purchased services only. "Pirate" decoders, or descramblers, allow the possessor to receive all of AT&T's scrambled programming without payment. Id. ¶ 11.

Marin's affidavit indicated that Marmer's website, "cabletvdescramblers.net," offered for sale several illegal cable descrambling devices, including "The Matrix" and the "Coolbox Avenger X." R1-10 at ¶ 2. Marin, posing as an ordinary customer, ordered "The Matrix." The package arrived, carrying a return address belonging to a Mail Boxes, Etc. store. Marin

(statutory or actual), an accounting, and the imposition of a constructive trust. R1-1 at 10-11.

[3]AT&T also requested expedited discovery, an accounting, and a general temporary restraining order, and preliminary injunction. See R1-5. Only the asset freeze and the seizure order are before us on appeal.

connected "The Matrix" and found that it was capable of receiving all of AT&T's scrambled premium and pay-per-view services in a certain viewing area.

After searching through public records, Marin and Frappier discovered Marmer's home address—21407 Pagosa Court—and began observing activity outside his home. Marin followed Marmer from the Pagosa Court address to a warehouse-type facility at 960 South Deerfield Avenue. Marin observed Marmer "carrying a black bag consistent with the size and shape of [a] laptop computer." Id. ¶ 11. He also observed Marmer drive to the Mail Boxes, Etc. location listed as the return address for "The Matrix," where Marmer retrieved packages "consistent with the size and shape of the illegal Matrix descrambler that [Marin] purchased from [Marmer]." Id. ¶ 12. Marmer then traveled from the Mail Boxes, Etc. to the Deerfield Avenue warehouse, where he unloaded the packages and then loaded additional packages retrieved from the warehouse. After Marmer departed, Marin searched a garbage dumpster near the warehouse and found several items that he concluded were "consistent with the operation of an illegal descrambler sales company." Id. ¶ 14. This suit and the orders at issue followed.

The district court initially denied AT&T's ex parte request for an asset freeze pending a showing of the specific assets to be frozen. The district court also initially denied AT&T's ex parte request to seize certain of Marmer's property

4

because AT&T "failed to show a likelihood that evidence will be destroyed or unavailable if such an order is not granted."[4] R1-13 at 4. However, the district court granted AT&T's request for an injunction and enjoined Marmer from:

> the sale, transfer, advertisement . . . , movement and/or offer for sale, modification, manufacture, storage and distribution of cable television decoding devices and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, movement, modification, manufacture, storage or distribution of such equipment . . . [and] from destroying, altering, removing or secreting any of [Marmer's] books and records . . . which contain information whatsoever concerning the business or finances of [Marmer] or otherwise reflect transactions of any kind involving Decoding Devices. . . .

Id. at 2-3.

Two days later, on 15 November 2002, AT&T filed an emergency motion to supplement the record and modify the district court's initial denial of an asset freeze and seizure of property. AT&T submitted a supplemental affidavit from Frappier, and the affidavit of Daniel Lefkowitz, an attorney who represented another cable company in an identical, prior litigation. Frappier's supplemental affidavit stated that Marmer was cutting off suppliers' shipping labels and shredding documents. R1-14, Ex. B at ¶¶ 6, 9, 10, 14. "[B]ased on [his] extensive experience," Frappier stated his opinion that, "absent a seizure, [Marmer is] likely

_____

[4]The district court also denied AT&T's motion for a search and seizure order because "the facts relied upon by [AT&T] are over thirty days old[.]" R1-13 at 4. This aspect of the district court's decision is not before us.

to . . . destroy evidence." Id. ¶ 7. Lefkowitz's affidavit identified the need for ex parte seizures in cable piracy cases based on numerous examples of defendants in other cases who destroyed or transferred sales records, pirate decoders, and business assets once provided with notice of legal action. R1-14, Ex. C at 3-6.

Based on this evidence, the district court granted AT&T's emergency motion for an ex parte asset freeze and seizure of property on 18 November 2002. The district court stated that AT&T, with the assistance of United States Federal Marshals, was permitted to search Marmer's Pagosa Court and Deerfield Avenue addresses and

> seize [and remove] any and all correspondence with customers, sales invoices, purchase orders, return forms, receipts, bank records, safe deposit box records, proceeds of sales, insurance policies, safes, shipping labels and tax returns of other business records, including all computer terminals, hard drives, servers, disks and tapes in their possession, which plaintiff reasonably believes contain or indicate the names or addresses of distributors, suppliers, manufacturers, and/or purchasers of Decoding Devices or any related equipment, or which contain, indicate or otherwise reflect or pertain to any transactions of any kind involving Decoding Devices or other business activities, and any and all Decoding Devices, and the illicit proceeds of the sales of such Decoding Devices.

R1-16 at 2. Marmer was also "restrained from transferring, removing, encumbering or permitting the withdrawal of any assets of property . . . real or personal, tangible or intangible." Id. at 1-2. In addition, the district court ordered

Marmer to "show cause . . . why this Temporary Restraining Order should not be confirmed and a Preliminary Injunction entered." Id. at 4-5.

On 25 November 2002, the day before the scheduled "show cause" hearing, AT&T and Marmer filed a "Preliminary Injunction and Agreed Order," wherein Marmer consented to be "permanently enjoined and restrained" from participation in the distribution of cable descramblers. R1-23 at 1. Marmer also consented to the continuation of the asset freeze, with the stipulation that he could challenge its imposition at a later date. R1-22 at unnumb. 2-3. On 20 December 2002, Marmer filed a " Motion to Dissolve Asset Freeze" and a "Motion for Return of all Items Seized." R2-37, 40.

AT&T responded to Marmer's motions with another affidavit of Marin stating that, during the search of Marmer's residence, AT&T discovered several fake driver's licenses bearing Marmer's photograph but not his legal name. R3-68 at ¶ 7. AT&T also seized $97,900 in cash located "in a briefcase concealed under a stairwell behind a water heater." Id. ¶ 12. In addition, seized tax returns indicated that Marmer set up a new corporate identity to sell illegal cable descramblers every twelve months on average. Id. ¶¶ 4, 8.

The district court denied Marmer's motions. Regarding the property seizure, the district court found that probable cause justified the search of Marmer's

warehouse facility and that the Leon[5] good faith exception applied to the search of Marmer's residence.[6] R3-85 at 1-2. Regarding the asset freeze, the district court concluded that, based on the information contained in Marin's second affidavit,[7] Marmer "should not be allowed to use [his] remaining assets to further other cable theft enterprises." R3-91 at 1. The district court also noted that "[g]iven the showing of a likelihood that assets unfrozen would not be available to satisfy any damage award, unfreezing this aspect of the November 18th Order is premature at this time." Id. at 2. Marmer now appeals.

## II. DISCUSSION

We first address whether we have jurisdiction over Marmer's appeal. After concluding in the affirmative, we state the proper standard of review. We then consider the district court's imposition of (and refusal to dissolve) the asset freeze, and, finally, we review the order permitting search and seizure of property from Marmer's residence (and refusal to return the seized property).

A. Jurisdiction

---

[5]United States v. Leon, 468 U.S. 897, 919-21, 104 S. Ct. 3405, 3418-19 (1984).

[6]In this appeal, Marmer challenges only the search of his residence, not the search of his warehouse.

[7]AT&T presented evidence, partially included in Marin's affidavit, "that Marmer has now been arrested for identity theft, that his corporations have been involved with pirating for many years and that there is no other financial basis for millions of dollars collected by these corporations other than cable piracy, also the corporations have been stealth-like." R3-91 at 1.

Before we address the merits of Marmer's appeal, we must first determine whether we have jurisdiction to hear his claims. While the grant of a motion for a preliminary injunction is appealable, the grant of a motion for a temporary restraining order ("TRO") is not. 28 U.S.C. § 1292(a)(1); Fernandez-Roque v. Smith, 671 F.2d 426, 429 (11th Cir. 1982). Marmer argues that the district court's denial of his motions to dissolve the asset freeze and return seized property was the denial of a request for modification of a preliminary injunction, and, therefore, is immediately appealable pursuant to 28 U.S.C. § 1292(a)(1). We agree.

Generally, our jurisdiction is limited to final orders and judgments of the district court. 28 U.S.C. § 1291. "A final decision is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983) (citation omitted). One exception to this general rule permits appeals from interlocutory orders granting or denying preliminary and permanent injunctions. See 28 U.S.C. § 1291(a)(1); Cable Holdings of Battlefield, Inc. v. Cooke, 764 F.2d 1466, 1470-71 (11th Cir. 1985); see also Fed. R. Civ. P. 65(a). Specifically, under 28 U.S.C. § 1292(a)(1), we have jurisdiction to review district court orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."

9

In deciding whether to characterize an order as one granting a TRO or as one granting a preliminary injunction, the label placed upon the order is not necessarily dispositive of its appealability. See McDougald v. Jenson, 786 F.2d 1465, 1472 (11th Cir. 1986). An order granting a TRO may be appealable as an order granting a preliminary injunction when three conditions are satisfied: (1) the duration of the relief sought or granted exceeds that allowed by a TRO (ten days), (2) the notice and hearing sought or afforded suggest that the relief sought was a preliminary injunction, and (3) the requested relief seeks to change the status quo. Cf. id. at 1472; Fernandez-Roque, 671 F.2d at 429.

In this case, all three conditions were satisfied: (1) AT&T requested relief that would extend well beyond ten days; (2) AT&T gave notice to Marmer before the entry of the agreed preliminary injunction and order, which is evident by the fact that the order was by consent; and (3) AT&T sought to change the status quo by significantly altering Marmer's state of affairs. Moreover, both parties agreed to the confirmation of the district court's 18 November 2002 TRO as a preliminary injunction. R1-22 at unnumb. 2. Thus, we will construe the district court's orders denying Marmer's motions to dissolve the asset freeze and for return of seized property as orders denying requests for modification of a preliminary injunction. As a result, we have jurisdiction to hear Marmer's appeal.

10

B.  Standard of Review

We review de novo the legal grounds upon which the district court relied to issue its order permitting Marmer's assets to be frozen and his property to be seized.  This That and the Other Gift and Tobacco, Inc. v. Cobb County, Ga., 285 F.3d 1319, 1321 (11th Cir. 2002).  We then review the district court's decision to issue the order for an abuse of discretion.  Id.

C.  Asset Freeze

Marmer argues that the district court's denial of his motion to unfreeze his assets was improper for two primary reasons:[8]  (1) the district court lacked statutory authority under § 553(c)(2)(A) of the CCPA to issue the order, and (2) the district court abused its discretion by refusing to dissolve the asset freeze after the parties entered an agreed injunction.[9]  We conclude that the district court had the

---

[8]Marmer also argues that the asset freeze violated our decision in Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1530 (11th Cir. 1994), where we stated that "preliminary injunctive relief freezing a defendant's assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority."  In this case, however, AT&T sought equitable relief (unlike the plaintiffs in Rosen) and the asset freeze was granted because Marmer "should not be allowed to use [his] remaining assets to further other cable theft enterprises."  R3-91 at 1.  Thus, the asset freeze was issued primarily to deter future violations of 47 U.S.C. § 553(a)(1), despite the district court's secondary statement that "[g]iven the showing of a likelihood that assets unfrozen would not be available to satisfy any damage award, unfreezing this aspect of the November 18th Order is premature at this time."  Id. at 2.

[9]Marmer does not assert any argument relating to the terms of the asset freeze.  In fact, at oral argument, Marmer's counsel abandoned the argument that the asset freeze should not have applied to Marmer's homestead since Marmer sold his homestead in violation of the asset freeze.

11

legal authority to issue the asset freeze, and that denial of Marmer's motion to dissolve the order was not an abuse of discretion.

1. Statutory Authority

The CCPA provides that, "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator."[10] 47 U.S.C. § 553(a)(1). District courts are authorized to "grant temporary and final injunctions on such terms as [they] may deem reasonable to prevent or restrain violations of subsection (a)(1)." Id. § 553(c)(2)(A). Marmer maintains that the district court's order was improper because § 553(c)(2)(A) does not explicitly authorize the district court to freeze assets to prevent violations of § 553(a)(1). We disagree.

The Supreme Court has dictated that, unless the underlying statute clearly and validly limits the equitable jurisdiction of the district court, "all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S. Ct. 1086, 1089 (1946). In other words, "[u]nless a statute in so many words, or

---

[10]The Act dictates that "the term 'assist in intercepting or receiving' shall include the manufacture or distribution of equipment intended by the manufacturer or distributor . . . for unauthorized reception of any communications service offered over a cable system." Id. § 553(a)(2). Marmer does not dispute that his activity satisfied this subsection and, thus, was a violation of § 553(a)(1).

12

by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." Id. Moreover, when "the public interest is involved . . ., [the district court's] equitable powers assume an even broader and more flexible character." Id.

Our court applied Porter in FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1432 (11th Cir. 1984) (per curiam), where we were asked to decide whether the district court properly ordered an asset freeze under section 13(b) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 53(b), which expressly permitted the district court to grant preliminary and permanent injunctions. We determined that "Congress, when it gave the district court authority to grant a permanent injunction . . . also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference." Id. at 1434 (quoting FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982)); FTC v. Gem Merch. Corp., 87 F.3d 466, 468-69 (11th Cir. 1996); see also FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 721 (5th Cir. 1982) (reasoning that section 13(b)'s authorization to issue preliminary injunctions authorized a grant of ancillary equitable relief under the "doctrine of inherent equitable jurisdiction.").

13

Thus, we concluded that the asset freeze entered by the district court was a proper use of the court's equitable powers. Id.

The CCPA contains language substantially similar to the language contained in section 13(b) of the FTCA. Moreover, as in U.S. Oil & Gas, this case involves the public's interest in preventing the sale of pirate cable descramblers. See H.R. Rep. No. 98-934, at 84 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4721 ("Theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it."). Thus, based on prior precedent, and considering Porter's admonition that the district courts' equitable powers apply even more broadly when the public interest is involved, we hold that the district court in this case had proper legal authority to issue its order freezing Marmer's assets. See CSC Holdings, Inc. v. Redisi, 309 F.3d 988, 996 (7th Cir. 2002); TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 208 n.4 (3d Cir. 2001); General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 90-91 (3d Cir. 1999). We now

14

consider whether the district court abused its discretion by refusing to dissolve the asset freeze.

2. Propriety of the Order

The Third and Seventh Circuits have concluded that an asset freeze, issued to prevent future violations of § 553(a)(1), is an appropriate equitable remedy. Redisi, 309 F.3d at 996; TKR Cable, 267 F.3d at 208 n.4; Nu-Tek, 197 F.3d at 90-91. After considering this caselaw, we conclude that the asset freeze in this case was also appropriate.

In Nu-Tek, the defendants altered legally manufactured cable decoders to enable them to receive all signals sent by the cable programmer, whether the decoder owner had paid for the programming or not. 197 F.3d at 85. A jury found the defendants guilty of violating § 553(a)(1) of the CCPA, and the district court subsequently imposed an injunction permanently enjoining the defendants from manufacturing or distributing the modified descrambler boxes. Id. at 86. The Third Circuit affirmed the district court's imposition of the injunction as an appropriate use of discretion because the defendant did not refute the district court's finding that "no identifiable legitimate business existed." Id. at 91. Moreover, the Third Circuit held that the defendant's business enterprise "essentially facilitated cable theft in violation of § 553. To stop such an operation

15

is a primary purpose of the injunction. . . . Likewise, [the defendant] should not be allowed to use its remaining assets, which in all likelihood can serve only to further other cable theft enterprises." Id. at 90-91 (quoting district court opinion with approval).

Two years later, the Third Circuit revisited Nu-Tek in TKR Cable Co., 267 F.3d 196. As in Nu-Tek, the TKR defendants were engaged in the distribution and sale of illegal cable descramblers. Id. at 197. The plaintiff-cable company obtained an ex parte TRO freezing the defendant's business and personal assets. Id. at 198. After a hearing, the district court issued a preliminary injunction continuing the asset freeze. Id. Based on its conclusion in Nu-Tek that the defendant-cable pirate "should not be allowed to use its remaining assets" in order to prevent "further cable theft enterprises," 197 F.3d at 90, the Third Circuit affirmed the district court's imposition of the asset freeze in TKR. 267 F.3d at 208 n.4.

One year after TKR, the Seventh Circuit faced similar facts in Redisi: the defendants operated several businesses engaged in the manufacture of pirate cable decoders. 309 F.3d at 990. After more than one year of investigation, the plaintiff-cable company filed a motion to freeze the Redisis assets. Id. at 991. The district court granted the motion and the Seventh Circuit affirmed, noting that, because the

16

plaintiff had requested equitable relief, "[a]n asset freeze [was] . . . proper to stop cable piracy that violate[d] the Communications Act." Id. at 996 (citing TKR, 267 F.3d at 208 n.4). The Seventh Circuit concluded that, "[s]ince the assets in question here were profits the [defendants] made by unlawfully stealing [plaintiff's] services, the freeze was appropriate and may remain in place pending final disposition of the case." Id.

In this case, as in Nu-Tek, TKR, and Redisi, the district court granted AT&T's request to freeze Marmer's assets so that Marmer could not "use [his] remaining assets to further other cable theft enterprises." R3-91 at 1. And as in Nu-Tek, Marmer has not presented any evidence identifying his engagement in any legitimate business enterprise.[11] Therefore, we agree with the Third and Seventh Circuits that the district court did not abuse its discretion by issuing the asset freeze.

Marmer also argues, however, that the district court's refusal to dissolve the order in the face of the parties' agreed injunction was improper. This argument fails because the agreed injunction states only that Marmer will no longer distribute pirate decoders; it says nothing about Marmer's use of his remaining assets. See generally R1-23; see also Century-ML Cable Corp. v. Carillo Diaz, 43 F. Supp. 2d

---

[11]In fact, during oral argument, Marmer's counsel all but conceded that no legitimate business enterprise exists.

166, 173 (D. P.R. 1998) ("The fact that such a pirating scheme, enabling the theft of [plaintiff's] signals in exchange for payment to the Defendants, is clearly illegal has to date not served as a sufficient deterrent to Defendants."). Moreover, other evidence indicated that an asset freeze may be necessary for Marmer to stop his illegal activities. For instance, AT&T presented evidence that Marmer had been arrested for identity theft and that his numerous corporations had consistently been involved in the cable pirating industry. In addition, Marmer offered no other explanation for the millions of dollars collected by these corporations. See R3-91 at 1. In the face of such evidence, we cannot say that the district court's refusal to dissolve the asset freeze was an abuse of discretion. To hold otherwise would thwart Congress's intent in enacting the CCPA: to preserve the economic viability of cable operators and programmers, and to prevent public subsidization of such illegal activity. See H.R. Rep. No. 98-934, at 84 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4721.

D. Search and Seizure of Property

Marmer argues that the district court's ex parte order allowing AT&T to seize pieces of his property from his residence was improper for two primary reasons:[12] (1) the district court lacked statutory authority under § 553(c)(2)(A) of

---

[12]Marmer also argues that the search and seizure of property from his home was an unconstitutional violation of his Fourth Amendment rights. Specifically, Marmer contends that

18

the CCPA to issue the order, and (2) the seizure order was unnecessary because AT&T presented no evidence that Marmer would violate the agreed injunction. We conclude that the district court had the legal authority to authorize the search and seizure, and that issuance of the order was not an abuse of discretion.

### 1. Statutory Authority

Identical to his argument regarding the asset freeze, Marmer argues that the district court lacked statutory authority under § 553(c)(2)(A) of the CCPA to issue its order allowing AT&T to search and seize property from his residence. Marmer argues that, when Congress wants to authorize this type of relief, they do so explicitly, as in the Lanham Act, 15 U.S.C. § 1116, which directly states that district courts may issue ex parte seizures. We disagree.

Marmer's argument fails to account for the Supreme Court's decision in Porter regarding the broad inherent equitable powers possessed by district courts, discussed in section II.C.1., supra. Simply because Congress has explicitly authorized equitable relief other than preliminary and permanent injunctions in the Lanham Act does not dictate that broader equitable relief is precluded per se under

---

AT&T presented insufficient evidence in support of its motion and, therefore, probable cause to search his residence was not present. However, because we conclude that the district court had legal authority to issue the seizure order and that issuance of the order was not an abuse of discretion (based on evidence presented regarding Marmer and other defendants like him, see section II.D.2, infra), Marmer's additional argument must fail.

19

the CCPA.  We have previously held that language similar to that contained in the CCPA did not contain a clear limitation on the district courts' inherent equitable authority.  U.S. Oil & Gas, 748 F.2d at 1434; Gem Merch., 87 F.3d at 469-70.  Nor does the CCPA, by necessary and inescapable inference, limit the district courts' broad equitable powers.  Id.  Based on this reasoning, we conclude that an ex parte search and seizure order directed at a defendant's residence, while certainly more drastic than an ex parte asset freeze, is an appropriate equitable remedy to protect the Congressional intent of the CCPA.  Accordingly, we hold that the district court had proper legal authority to issue the search and seizure order in this case.  We now consider whether issuance of the order *in this case* was an abuse of discretion.

2.  Propriety of the Order

When the defendant's identity is known and notice could feasibly be given, ex parte seizures are proper only if providing notice to the defendant would "render fruitless the further prosecution of the action."  In re Vuitton et Fils, S.A., 606 F.2d 1, 5 (2d Cir. 1979) (per curiam); see First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 650 (6th Cir. 1993); Am. Can Co. v. Mansukhani, 742 F.2d 314, 322 (7th Cir. 1984).  To support an ex parte seizure motion, the plaintiff may not rely on bare assertions that the defendant, if given notice, would destroy relevant evidence.  Depinet, 11 F.3d at 650-51.  Rather, the plaintiff must "show that [the]

20

defendant[ ], or persons involved in similar activities, had . . . concealed evidence or disregarded court orders in the past." Id. at 651; see also Vuitton v. White, 945 F.2d 569, 575 (3rd Cir. 1991) (ex parte seizure order granted under Lanham Act based on "the fact that at least four of the street vendor defendants apparently are selling counterfeits in violation of the permanent injunction" issued in an earlier action); In re Vuitton, 606 F.2d at 2 (see below).

In In re Vuitton, the plaintiff requested an ex parte TRO to prevent the defendants from continuing to sell counterfeit merchandise. 606 F.2d at 1-2. The district court refused to grant the order and the Second Circuit reversed, noting that the plaintiff had presented evidence based on its past experience in 84 similar cases and hundreds of investigations revealing that once a counterfeiter learned of an action against him, he would "immediately transfer his inventory to another counterfeit seller, whose identity would be unknown." Id. at 2 (quoting an affidavit submitted by the plaintiff's attorney). The Second Circuit ordered the district court to issue an ex parte TRO "narrow enough . . . to protect the interests of the defendants." Id. at 3.

As in In re Vuitton, AT&T presented evidence that other pirate descrambler sellers had secreted evidence once notice of a pending search was given. Specifically, AT&T submitted the affidavit of Daniel Lefkowitz, an attorney who

21

represented another cable company in similar litigation, detailing numerous cases where defendants charged with violation of the CCPA destroyed or transferred records, evidence, and assets. R1-16, Ex. C at 3-6.[13] AT&T also submitted evidence that a search of Marmer's residence would uncover relevant evidence. Specifically, Marin's additional affidavit indicated that when Marin called Marmer to place an order, Marmer "indicated he was working at home." R3-68 at ¶ 11. Marmer also "indicated that he often forwarded his phone to his home and worked at home selling descramblers as late a[s] midnight." Id. In addition, Marin stated that, during his phone call with Marmer, Marmer "retrieved records pertinent to [his] purchase from [the] Pagosa Ct. address." Id.

We conclude that this evidence was sufficient to support AT&T's request for an ex parte seizure order encompassing Marmer's residence. Accordingly, we hold that the district court's issuance of the order authorizing AT&T to search and seize property from Marmer's home—and its subsequent denial of Marmer's motion for return of the seized property—was not an abuse of discretion.[14]

---

[13]At least two district courts have also noted the frequency of such conduct. See Comcast of Ill. X, LLC v. Till, 293 F. Supp. 2d 936, 940 (E.D. Wis. 2003) (listing reported cases where sellers of decoders have destroyed evidence); Carillo Diaz, 43 F. Supp. 2d at 174 (same).

[14]Regarding the district court's refusal to return seized property, Marmer did not argue, as he had regarding dissolution of the asset freeze, that the court's refusal was improper in the face of the agreed preliminary injunction. Issues not raised on appeal are considered abandoned. United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001).

## III. CONCLUSION

Marmer challenged the district court's imposition of, and refusal to modify, an ex parte order authorizing Marmer's assets to be frozen and certain of his business property to be seized under the CCPA. We hold that the district court had legal authority to issue both the asset freeze and the seizure order. We also hold that, in this case, issuance of both orders was a proper exercise of the district court's discretion. Accordingly, the orders of the district court are AFFIRMED.