[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16848
_____

D.C. Docket No. 7:14-cv-00112-HL


RONNIE SMITH,
ELMA J. JOHNSON,
DEREK COLSON,
ALLEN D. POWELL,
CURTIS BRADSHAW,

Plaintiffs-Appellants,

versus

THOMASVILLE GEORGIA,
a government entity,
THOMASVILLE GEORGIA FIRE DEPARTMENT,
a government entity,
BRYAN CROFT,
Individually,
TIM CONNEL,
Individually,
DOES,
1 through 10, Inclusive,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(October 2, 2018)

Before ED CARNES, Chief Judge, BRANCH, and FAY, Circuit Judges.

PER CURIAM:

This appeal involves a lawsuit filed by five firefighters in the City of Thomasville:  Derek Colson, Curtis Bradshaw, Allen Powell, Elma Johnson, and Ronnie Smith.  At the time that their lawsuit was filed they were the only black firefighters in the City.  Each of them raises several claims under Title VII, 42 U.S.C. § 1981, and state law.  Most of the claims assert discrimination against the plaintiffs by then-Fire Chief Bryan Croft, then-Assistant Fire Chief Tim Connell, and the City.  The district court granted summary judgment to all of the defendants.  All of the plaintiffs now appeal.

## I.  BACKGROUND

### A.  FACTS

The facts underlying most of the claims are unique to each plaintiff, although some of them overlap.  For the sake of clarity, we will go over some background information about the fire department's structure and then separately detail the facts material to each plaintiff.  Except that the intertwined facts

2

underlying the claims of plaintiffs Colson and Bradshaw make it easier to discuss them together.  It also makes more sense to save the recounting of the facts involving the five plaintiffs' disparate pay claims for the discussion section.

### 1.  Structure of the Fire Department

A firefighter's duties in the Thomasville Fire Department depend on his rank and what we'll call his "position."  The rank is the firefighter's place in the department hierarchy.  That hierarchy appears to go in some order like this, from lowest to highest:  Firefighter, Driver-Engineer, Lieutenant, Captain, Battalion Chief/Assistant Chief, and Fire Chief.

Promotions to the ranks of Driver-Engineer, Lieutenant, and Captain are based on testing.  All of the tests are based on the International Fire Service Training Association testing manuals (IFSTA for short).  IFSTA is "the nationally recognized fire organization that prints the training material[s] . . . for the fire service."  The fire department uses a random question generator that bases the questions in tests on the information covered in the IFSTA materials.  The program comes up with a new set of questions each time it is prompted to generate a test.  As a result, no one in the department can manipulate the tests to favor one test taker over another.

After the candidates take the test, the Human Resources department gives the Fire Chief a list of the "top" applicants ranked from the highest score down.

Although the Chief has the "final say" on promotions, where there was a test for the position, he always selected the person with the highest score on the test.

A firefighter's position is not the same as his rank, but instead is his specific job in the department. There are two categories of position that are relevant here: suppression and prevention. Suppression is what most people would think of as regular firefighter duties: putting out fires. Most firefighters in suppression work 24-hour on, 48-hour off shifts. (They get paid for both sleeping and waking hours while they are on shift.) Prevention positions, by contrast, focus on efforts to prevent fires and to educate citizens. Unlike suppression, prevention positions usually involve regular 8 a.m. to 5 p.m. work days. Certain positions require specialized certifications and training, and firefighters usually must get permission from the Fire Chief to take certification and training courses.

2. <u>Derek Colson and Curtis Bradshaw</u>

*a. Background and history of Colson's and Bradshaw's positions and promotions within the fire department*

Thomasville hired Derek Colson as a firefighter on November 27, 2000. In his time with the fire department, Colson has received three promotions. His first was in December 2003, to the position of Driver-Engineer. His second came around two years later, when Colson was promoted to the position of Life Safety Educator and the rank of Lieutenant. The Life Safety Educator is a position that focuses on educating people on how to stop and prevent fires. It also involves

4

assisting the Fire Inspector in performing inspections around town.  Unlike the 24-hour on, 48-hour off shifts for suppression positions, the Life Safety Educator is an 8 a.m. to 5 p.m. job.

The following year, in 2006, Colson received his final promotion to the position of Fire Inspector, which is the head of prevention.  It, too, is an 8 a.m. to 5 p.m. job.  The most important part of the job, of course, is conducting fire inspections at the City's hazardous facilities and its 1,300 businesses.  Colson's white predecessor as Fire Inspector, Clay Phillips, received a promotion in rank from Lieutenant to Captain when he moved from the Life Safety Educator position to the Fire Inspector position.  Colson did not.  Colson presented no evidence to show how long Phillips was a Lieutenant before he was promoted to Captain.  And there is no evidence in the record that Colson ever took the Captain's promotional test or completed the other steps necessary to be considered for a promotion to Captain.

Thomasville hired plaintiff Curtis Bradshaw as a firefighter on April 5, 2004.  Two years later he sought and received the position of Life Safety Educator, on Chief Croft's recommendation.[1]  Croft, who is white, recommended Bradshaw for the promotion even though there were other applicants with more experience.  As Life Safety Educator, Bradshaw helped plaintiff Colson perform Fire

---

[1] Croft served as Fire Chief from 2005 to 2012.

5

Inspections throughout the City.  Bradshaw's promotion came with a raise from $7.96 an hour to $12.50 an hour.  But unlike Colson, Bradshaw was not promoted to Lieutenant.  Bradshaw believed that because other Life Safety Educators were Lieutenants, he should have also been promoted to Lieutenant, as Colson was.  But when he was made Life Safety Educator, Bradshaw had not completed the required coursework to be considered for a promotion to Lieutenant.  He later testified that he was not being considered for that promotion because he had not completed the required coursework.

### b. Colson and Bradshaw ask to get certified as Arson Investigators

In 2008 plaintiffs Colson and Bradshaw wanted to become certified as arson investigators.  To do that, they needed to take two courses.  And they needed Chief Croft's permission to take each of them.  As part of the first course, a firefighter had to complete classroom work and ten arson investigations under the supervision of a certified arson investigator.  Colson and Bradshaw finished the classroom work for the first course.  But Colson had not completed any of the ten required arson investigations, and Bradshaw had completed only three.  So Croft did not give either of them permission to take the second course.  According to Croft, Colson and Bradshaw had been given the opportunity to complete the arson investigations but did not do them.

6

Croft had allowed two white firefighters to take the second part of the course: Jeff Huntley and Craig Dukes. But both had completed their classroom work and the ten arson investigations before he allowed them to take the second course.

*Croft has concerns with Colson's and Bradshaw's performance*

### i. *The June 15 meeting*

Sometime in the middle of 2011, Chief Croft started having concerns with Colson's and Bradshaw's performance in fire inspections. He was worried that the commercial fire inspections were not getting done in a timely manner and that the records of inspections were not being properly maintained in the department's computer system.[2] Croft raised his concerns with the head of the City's HR department, Kha McDonald, and the two established some benchmarks to give Colson and Bradshaw an opportunity to improve their work. On June 15, 2011, Chief Croft and Assistant Chief Tim Connell met with Colson and Bradshaw to discuss Croft's concerns and give them the benchmarks they should use to improve their performance. Croft also told them that instead of getting their usual annual

---

[2] Croft had sampled 15 of the 1,300 businesses in town. Some of those business had not been inspected in the last four or five years. Even though one of the defendants, Assistant Chief Tim Connell, testified that it would be impossible to inspect all 1,300 of Thomasville's businesses in a year (or even two years), based on the number of years that Colson and Bradshaw had worked in fire prevention, Chief Croft testified that they should have inspected every business "at least once."

7

"merit increase" of 3% of their salary, they would each get only a 1.5% raise. But if they successfully met the benchmarks, they would get the full 3%.

### ii. *Colson and Bradshaw file their first EEOC charges on August 25, 2011*

On August 25, 2011, Colson and Bradshaw filed their first EEOC charges. In the charges, the two claimed that they had been discriminated against based on their race and that the City paid them less than their white coworkers. Both complained that the June 15 meeting amounted to a negative performance evaluation. After the charges were filed, Croft called a meeting of all the Battalion Chiefs, including another plaintiff, Allen Powell, and promised them that the charges would "never make it to court."

### iii. *The September 30 meeting*

According to Colson and Bradshaw, after they filed their EEOC charges a series of events took place that they contend were retaliatory. The first involved their reassignment from the positions of Fire Inspector and Life Safety Educator, which were prevention positions, back to suppression. That string of events began on September 30, 2011, when Colson and Bradshaw had another meeting with Chief Croft to discuss their performance since the June 15 meeting.

At that meeting, Croft followed up on some of the benchmarks that were set for the pair back at the June 15 meeting, focusing on the most important areas. That included, among other things, the hazardous facilities and commercial

8

building inspections.  Croft asked them "if all of the [h]azardous facilities within [Thomasville] have been inspected" and if the contact information and chemicals for those facilities had been entered into the fire department's computer system. Both replied that they had done all of that.  But when Croft checked the computer system, he "found their answers to be untrue."  There was "very little contact information[,] if any," and no hazardous chemicals were listed.

Croft then allowed Bradshaw to leave the meeting and asked Colson to stay "a little longer" to do a "quick random audit" of businesses in the City to see when they were last inspected.  Out of thirteen businesses in the audit, two had been inspected within the last year — which was acceptable — but the other eleven had not been inspected since 2005.  And out of those eleven, three businesses did not have any records of inspections at all.  Colson and Bradshaw have since explained that the reason there was no record of inspections on the department's computer system was that they kept only paper records.  They speculated that someone could have broken into their office and taken some of their paper records, but they did not have any knowledge that had happened.

### c.  *Colson and Bradshaw are reassigned to suppression*

A few days after the meeting, Chief Croft wrote again to the head of HR, Kha McDonald, saying that Colson and Bradshaw's failure to timely perform and document inspections showed a "lack of accountability and professionalism."

Because of that, he told her, there was no reason to approve the remaining part of the merit raise for Colson or Bradshaw. He also recommended that a planned reorganization of the fire department be put into place immediately because, in his eyes, Colson's and Bradshaw's poor performance was also a safety issue.

On November 14, 2011, Colson and Bradshaw were removed from their roles as Fire Inspector and Life Safety Educator and put back into suppression. That same month, Colson was replaced by Captain Tommy Benton, who is white. Benton suffered from early onset Alzheimer's disease and needed another firefighter to drive him around to do inspections. Although Croft knew that Benton had some "medical issues" that he understood were "mental," he testified that he did not know that Benton had Alzheimer's when he chose him to replace Colson. Connell, the firefighter who drove Benton, testified that Benton's condition, whatever it was, had not affected his ability to conduct fire inspections.

As a result of being removed from their positions and put back into suppression, Colson's and Bradshaw's scheduled hours and hourly pay rates changed. Their hours changed from regular 8 a.m. to 5 p.m. days to shifts of 24-hours on, and 48-hours off. Colson's hourly rate went from $17.09 to $12.21 an hour, and Bradshaw's went from $14.57 to $10.41 an hour. Despite that, because firefighters are paid for both sleeping and waking hours while on shift, Colson and

10

Bradshaw did not earn any less on an annual basis than they had in their prevention positions, but they did work more hours to earn the same pay.

### d. *Colson is investigated for stealing funds meant for charity*

Later in the fall of 2011, Colson became the target of an investigation into the alleged theft of funds from the department's charitable recycling program. One of his duties as a Fire Inspector was to manage that program for the department. Colson and Bradshaw would recycle aluminum cans that were donated by the public and give the proceeds to the Georgia Burn Victims Foundation on behalf of the fire department. At some point someone from the Foundation told the fire department that it had not received any donations since 2005, even though cans had been collected from the fire department all of that time.

The fire department reported the crime to Thomasville police who, in order to avoid a possible conflict of interest, referred it to the Georgia Bureau of Investigation. The investigation found that records showed that Colson had collected cans on at least two occasions when the money was never turned over to the Foundation. According to investigators, on one of those occasions Colson instructed the recycling center to make the check out to him personally instead of the fire department. The Foundation never received that money. And in November 2011, GBI agents eventually arrested Colson for theft, though the charges were later dropped.

11

Colson says that the investigation was nothing more than a way to undermine his EEOC charge. He testified at his deposition that he gave all of the recycling proceeds to Chief Croft, though GBI never considered Croft a suspect. After his arrest, the City suspended Colson from work, and he was placed on paid leave beginning on November 23, 2011, for about a year while the investigation was being conducted.[3]

*e.  Colson and Bradshaw file their second EEOC charge, and the EEOC gives them Notice of Right to Sue*

Colson filed a second EEOC charge on March 20, 2012, and Bradshaw did so on April 6, 2012. In their second charges, they contended that they had been denied merit raises and were demoted in retaliation for filing their first EEOC charges. On April 17, 2014, the EEOC issued Colson and Bradshaw a Notice of Right to Sue for their first two charges.[4]

---

[3] In their brief to this Court, Colson and Bradshaw also point to other evidence that they contend supports their allegation that Chief Croft acted with a racially discriminatory motive. That evidence included: (1) an email that Croft forwarded to Colson predicting that, due to the stresses of the Presidency, the recently elected Barack Obama would look like the actor Red Foxx in the sitcom "Sanford and Son" by the time he left office; (2) that Croft gave his spare City credit card to a less senior white employee to use during a business trip instead of giving it to Colson or Bradshaw; and (3) that Croft once remarked to a white co-worker that "when he became Chief . . . he would get rid of the blacks and old timers."

[4] In August 2014, over two years after he filed his second EEOC charge, Bradshaw was transferred to another fire station, Engine 1, which according to him responds to the majority of the fire department's calls. Bradshaw eventually filed a third EEOC charge on January 8, 2015, alleging that that transfer was in retaliation for his earlier charges. Bradshaw was eventually fired. And he filed his fourth EEOC charge on July 9, 2015, alleging that he was "subjected to more severe discriminatory treatment" and that he was fired in retaliation for his earlier EEOC charges and because of his race. But in this appeal Bradshaw does not raise any claims with respect to his transfer to Engine 1 or his termination.

### 3. Allen Powell

Allen Powell is one of the longest tenured firefighters in the department. He's been a firefighter in Thomasville since 1990 and has risen through the ranks over that time to become a Battalion Chief. As a Battalion Chief, the only member of the department who outranks Powell is the Chief. Powell's complaints of discrimination in this appeal focus on the denial of training and promotional opportunities, and on disparity in pay (which we will address later in this opinion).

*a. Powell asks Croft for the Opportunity to Train as an Arson Investigator*

Like Colson and Bradshaw, Powell asserts that Chief Croft denied him the opportunity to train as an arson investigator. According to Powell, in 2007, 2009, and 2010, he asked to take the second part of the arson investigation course, but Croft never allowed him to. He asserts that Croft "wanted to send his friends first," like Craig Dukes and Jeff Hundley, who are both white and were allowed to take the second part of the course.

Chief Croft recalls Powell asking him twice about arson investigation training. When Powell first approached Croft about training as an arson investigator, Croft said that the training would take too long, and that he needed Powell at the firehouse. When Powell asked a second time, Chief Croft agreed that he could do the training but told Powell that he could not be the official arson investigator for the fire department. Croft explained that it would be a conflict of

13

interest for Powell to investigate a fire that he had helped to put out. Powell understood that it would be perceived as a conflict, but he wanted to take the training anyway.

### b. *Powell is not considered for the jobs of Assistant Chief and interim Chief*

Powell also contends that he was denied two promotional opportunities because of his race: one for Assistant Chief and one for interim Fire Chief.[5] In 2009, Chief Croft created the position of Assistant Chief to oversee the fire department when he was not there. Like Battalion Chiefs, the Assistant Chief reported directly to the Fire Chief. But unlike Battalion Chiefs, the Assistant Chief was an administrative position that was on an 8 a.m. to 5 p.m. schedule instead of the 24-hour on, 48-hour off shifts of the Battalion Chiefs. Croft had Tim Connell, who is white, in mind for the position. At the time, Connell was a Captain and the training officer for the fire department. Because the Assistant Chief position was not posted, other firefighters could not apply for it. Powell believed that he should

---

[5] In his brief to this Court, Powell also appears to argue that he should have been promoted to Fire Chief (and not just interim Fire Chief) because the City had a practice of promoting from within the department. But Powell testified in his deposition that his complaint involved the interim Chief (and not the permanent) position. Powell did not argue to the district court that he should have been promoted to the permanent Fire Chief position. So that argument, if Powell is making it, was not properly preserved. Juris v. Inamed Corp., 685 F.3d 1294, 1325 (11th Cir. 2012) ("[I]f a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it."); id. ("A federal appellate court will not, as a general rule, consider an issue that is raised for the first time on appeal.") (quotation marks omitted). And, in any event, Powell did not present evidence that Chris Bowman, whom the City ultimately hired as Chief, was not more qualified than he was.

14

have been considered for the job over Connell because he had ten years more experience than Connell did. But after Connell's appointment, Powell never complained to Chief Croft or to the City's HR department about not being considered for Assistant Chief.

In 2012, after Croft resigned as Chief, the City needed to appoint an interim Chief. It chose Battalion Chief Bobby Hart, who is white, for the position. Hart was chosen because he had the most seniority within the fire department (even more than Powell). There is no evidence in the record that the interim Chief position was posted or advertised. Hart was placed in it without any formalities. And he served as interim Chief until the City hired Chris Bowman as the permanent replacement for Croft. Powell did not object to Hart being named interim Chief, but he says that he should have been given the opportunity to apply for the position. Powell had applied for the permanent Chief position every time it came open in the past. The last time the Chief position was open, Powell interviewed for it with Steve Sykes, the same City Manager who selected Hart to be interim Chief.

### c. Powell's EEOC Charge

Powell filed an EEOC discrimination charge on November 2, 2012. In it he alleged that he "was not given the opportunity to apply for the position of [interim] Chief," because "[t]he position was not posted, but a similarly situated White male

15

was hired." Although Powell alleged in the charge that he complained about the posting and selection process for interim Chief and Assistant Chief, he later testified that those complaints were generally made to "guys in the department" and not through any official channel. On April 17, 2014, the EEOC issued Powell a Notice of Right to Sue.

### 4. Elma Johnson

Elma Johnson has worked as a firefighter for the City of Thomasville since August 4, 1985, even longer than Powell, who was hired in 1990. He was promoted to the rank of Lieutenant in 1997 after he had the highest score on the promotional test. In 2005, two Captain spots came open in the department. Although Johnson applied for the promotion, he did not get it. Two white firefighters, Tim Connell and Mark Sealy, got the promotion because of their higher test scores. Johnson asserts that Croft and Connell conspired to create and rig the test to prevent him from getting the promotion, but he has provided no evidence of that.

Johnson tried for a promotion again in 2011 when another Captain position came open. He took the test, and of the applicants he ranked third on the test and second in seniority. But another firefighter, Marty Butler, who is white, got the promotion. Although Johnson presented no evidence of Butler's test score, he contends that he was discriminated against because Chief Croft made the

16

promotion decision.  But Croft testified that he always selected the applicant with the highest score on a promotion test, and there is no evidence to dispute that.

Johnson also claims that he was not considered for the position of Fire Inspector after Colson and Bradshaw were reassigned and that he was not allowed to train to be an arson investigator.  But he admits that he never expressed any interest in either position to anyone in a position of authority.

After Colson was reassigned to suppression, Chief Croft selected Tommy Benton, who is white, for the Fire Inspector position.  Croft filled that position without posting any notice that it was available.  At the time, Benton was suffering from dementia as a result of early onset Alzheimer's disease.  But, as we have already mentioned, Croft testified that he did not know Benton's specific condition at the time.  He knew only that Benton was suffering from "medical issues" that were "mental."

After Johnson learned that Croft had selected Benton for the Fire Inspector position without posting it, he complained to Kha McDonald in HR.  McDonald addressed Johnson's concerns in a memo, explaining that Benton had been selected as Fire Inspector "to fill an immediate need for the work that needs to be done while, at the same time, accommodating the uncertainties of [Benton's] existing medical condition."

17

Johnson filed an EEOC charge of discrimination on June 13, 2012, alleging that he was "treated less favorably regarding training and promotion due to [his] race." On April 17, 2014, the EEOC issued Johnson a Notice of Right to Sue.

### 5.  Ronnie Smith

Ronnie Smith is a driver-engineer in the fire department. He has worked for the City since 1990 and for the fire department since 1993. Smith's main contention is that the department does not give black firefighters as much help preparing for promotional tests as it gives white firefighters. Smith took, and failed, the Lieutenant test several times. Even after Connell gave Smith a copy of the IFSTA test books to study (the books from which the test questions are drawn), Smith still did not pass.[6] According to Smith it was because what he studied in the books was not on the tests. He claims he passed the test only after getting copies of some of the materials that Connell had given to white firefighters (though Smith's score was still not high enough to merit a promotion to Lieutenant). Smith testified that he never complained to his superiors about not being promoted after passing the test.

According to Connell, the fire department library had "at least one" copy of each of the relevant IFSTA books. Any firefighter could borrow at any time those

---

[6] Smith's deposition testimony contains a transcription error. He testified that he was given the "Ithaca Firefighter IV book," but throughout the record those materials are referred to as the IFSTA handbooks. And that is what we will assume Smith meant.

books to study for the promotional tests.  And again, because the tests are randomly generated by a computer, the results cannot be manipulated.  See supra at 3.

Smith filed an EEOC complaint on January 3, 2012, alleging that he was discriminated against because white firefighters were given answers to test questions for promotional tests and he was not.  On October 16, 2012, the EEOC gave Smith a Notice of Right to Sue.[7]

## B.  PROCEDURAL HISTORY

The five plaintiffs filed a consolidated complaint on July 16, 2014, claiming that the City, Chief Croft, and Assistant Chief Connell had discriminated and retaliated against them in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and Georgia Code § 45-19-29.  All five plaintiffs raise claims that the fire department discriminated against them on the basis of race in promotions and pay.  They also brought hostile work environment claims.  In addition, Colson, Bradshaw, Powell, and Johnson brought disparate treatment claims involving Croft's refusal to allow them to train as arson investigators.  Finally, Colson and Bradshaw claimed that the defendants retaliated against them for filing their first EEOC charges.

---

[7] The defendants never raised any issue about the timeliness of Smith's claims in the district court.

The defendants moved for summary judgment, which the district court granted on all claims.  The plaintiffs have appealed the district court's judgment against them on all of the claims — except the hostile work environment claims, which they have abandoned.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. Crawford v. Carroll, 529 F.3d 961, 964 (11th Cir. 2008).  "Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).  In viewing the evidence, we draw all reasonable inferences in the light most favorable to the nonmovant.  Crawford, 529 F.3d at 964.

## III.  DISCUSSION

The legal bases for the racial discrimination claims are three statutes:  Title VII, 42 U.S.C. § 1981, and Georgia Code § 45-19-29.  The Title VII analytical framework applies to all of them.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that claims under Title VII and § 1981 "have the same requirements of proof and use the same analytical framework"); Finney v. Dep't of Corr., 434 S.E.2d 45, 45–46 (Ga. 1993) ("[I]n construing

20

[§ 45-19-29], our courts may seek guidance from federal decisions construing similar federal statutes.").

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The plaintiff bears the burden of establishing a prima facie case of race discrimination. See Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997). That can be done with either direct or circumstantial evidence. Id. at 1561–62.

In this case, as in most cases, the plaintiffs rely on circumstantial evidence. Claims based on circumstantial evidence typically use the familiar burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under that framework, a plaintiff must set forth "facts adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562. That can be done by establishing a prima facie case which creates a rebuttable presumption that the employer unlawfully discriminated against the employee. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

Once a plaintiff has established a prima facie case, the burden shifts to the employer to produce "legitimate, nondiscriminatory reasons for the challenged employment action." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th

21

Cir. 1997). Producing evidence (whether ultimately persuasive or not) of legitimate nondiscriminatory reasons for its actions is enough for the employer to satisfy its burden. See id.

If a defendant carries its burden of production, the initial presumption of discrimination established by the plaintiff's prima facie case evaporates. Wilson, 376 F.3d at 1087. "[A]nd the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Id. "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." Id. at 1088.

With that in mind, we will take up each of the plaintiffs' claims, starting with the ones involving failure to promote and disparate treatment in training. We will then go to Colson's and Bradshaw's retaliation claims. And we will end with the plaintiffs' wage discrimination claims.

## A. FAILURE TO PROMOTE

All five of the plaintiffs raise failure to promote claims. They contend that the defendants are not entitled to summary judgment because there is a genuine issue of material fact about whether the fire department gave promotional opportunities to white firefighters that were denied to black firefighters. The district court found that none of the plaintiffs had established a prima facie case.

22

To make out a prima facie case of racial discrimination based on a failure to promote, a plaintiff must establish "(1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." Combs, 106 F.3d at 1539 n.11.

Colson's, Bradshaw's, and Smith's claims all involve promotions that were exclusively based on the IFSTA tests. Some of Johnson's claims involve the tests and some do not. And Powell's promotion claims do not involve the tests at all.

### 1.  Promotions Based on Tests

Colson's, Bradshaw's, Johnson's, and Smith's test-based claims fail because none of them has pointed to evidence creating a genuine issue of material fact that he was qualified for the promotions at issue. As a result, none of these plaintiffs has made out a prima facie case of discrimination. See id.; see also Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005) ("[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications.").

Colson complains that he was not promoted from Lieutenant to Captain when he moved from the Life Safety Educator position to the Fire Inspector position, while white firefighters, like Colson's predecessor Clay Phillips, were promoted to Captain when they made that move. Bradshaw makes a similar

23

complaint about not being promoted to Lieutenant when he became Life Safety Educator. But Colson and Bradshaw point to no evidence that they took (let alone passed and scored the highest on) the relevant promotional tests for Captain (Colson) or for Lieutenant (Bradshaw). Without that, they have failed to show that they met the fire department's objective qualifications for a promotion in rank. In addition, Colson also hasn't shown that he was as qualified as Phillips was for the promotion to Captain — that is, he has not shown that Phillips also failed to take the promotional test. And Bradshaw hasn't pointed to any employee outside of his protected class who was promoted to Lieutenant without taking the required promotional test.

Johnson claims that he was denied a promotion to Captain because of his race. He applied for a promotion to Captain in 2011. Even though Johnson did well on the test — ranking third — Marty Butler, who is white, got the promotion. Chief Croft testified that he always promoted the employee with the highest score on the promotion test, and Johnson presented no evidence to rebut that testimony. He presented no evidence that Butler had not scored first or second on the test, and without that evidence there is no genuine issue of material fact that Butler was not more qualified than Johnson.[8] See Combs, 106 F.3d at 1539 n.11 (explaining that

---

[8] Johnson also made the unsupported assertion that Croft and Connell conspired to create and rig the test to prevent him from getting a promotion. Because he did not assert that claim on appeal, it is abandoned. See AT&T Broadband v. Tech Commc'ns., Inc., 381 F.3d 1309, 1320 n.14 (11th Cir. 2004). But even if he had preserved it, the defendants presented evidence that the

24

the plaintiff must establish that "other equally or less qualified employees who were not members of the protected class were promoted").

The same is true for Smith. Although he eventually passed the Lieutenant's test, he, like Johnson, failed to produce any evidence that his test score was the same or higher than the score of the person who was promoted. And because Smith failed to show that, he has not created a genuine issue of material fact that he was the most qualified person for the promotion.[9]

Even if the plaintiffs had presented adequate prima facie cases, they would still lose because their failure to bring forward evidence of test scores as high or higher than the employees who were promoted also serves as the defendants' proffered race-neutral reason for not promoting them. A plaintiff's lower promotional test score is a legitimate and nondiscriminatory reason for not promoting the plaintiff. And none of the plaintiffs has pointed to any evidence showing that proffered reason is pretextual. As a result, the district court properly granted summary judgment against Colson, Bradshaw, Johnson, and Smith on their claims for discriminatory failure to promote.

## Promotions Not Based on Tests

tests are randomly generated by a computer, so the questions and results cannot be manipulated. Johnson does not cite any evidence to the contrary.

[9] In the district court, Smith also appeared to raise a claim involving the testing procedures and preparation. But he has not pursued it on appeal, so it is abandoned. See AT&T Broadband, 381 F.3d at 1320 n.14.

a. *Powell*

Powell contends that he was denied two promotional opportunities because of his race. One was for the position of interim Chief in 2012 and another was for Assistant Chief in 2009. Powell was qualified for both of those positions, but they went to Bobby Hart and Tim Connell respectively, both of whom are white. The district court ruled that Powell could not make out a prima facie case on the failure to promote him to either position because he never expressed an interest in them.

Powell argues that he did not have to apply for or express an interest in those positions because neither job was posted. Unlike promotions to Lieutenant and Captain, there is no evidence that the department ever formally announced openings for interim Chief or Assistant Chief. Both were filled informally. In Carmichael v. Birmingham Saw Works, we explained that when an employer uses informal procedures for determining who would be offered a promotion, a "plaintiff [is] not required to ask specifically for [a] job when he did not know about it and where there was no formal mechanism for expressing his interest." 738 F.2d 1126, 1132–33 (11th Cir. 1984). We held that in those circumstances a plaintiff makes out a prima facie case "as long as he establishes that the [employer] had some reason or duty to consider him for the post." Id. at 1133. If the employee establishes that, the employer "cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job."

Id. at 1133–34.  Such a rejection is not a legitimate nondiscriminatory reason when the plaintiff has "no notice of or opportunity to apply for [a] job" when informal procedures are used.  Id. at 1134 (quotation marks omitted); see also Vessels, 408 F.3d at 768 ("[W]here an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position—only that the employer had some reason to consider him for the post.").

### i.    The interim Chief Position

To be sure, even though there was no formal notice for the availability of the interim Chief position, Powell would have had constructive notice that it was available once Chief Croft, his boss, resigned.  So the Carmichael informality exception doesn't apply, and to make out a prima facie case Powell still has to show that he asked to be considered for the position.  Cf. Carmichael, 738 F.2d at 1132–33 (explaining that the "plaintiff [is] not required to ask specifically for [a] job when he did not know about it") (emphasis added).

And even if Powell could establish a prima facie case, his interim Chief promotion claim would still fail because he cannot show pretext.  The City proffered that the reason it promoted Hart to the position is that he was the most senior member of the fire department.  Powell does not offer any argument or evidence to rebut that reason.  As a result, the defendants are entitled to summary

27

judgment on Powell's claim of discriminatory failure to promote him to interim Chief.

### ii.    The Assistant Chief Position

Unlike the interim Chief position, Powell did not know or have any reason to know that the newly-created Assistant Chief job was going to become available. Chief Croft did not post or otherwise announce the availability of that position. So Powell cannot be faulted for not applying. As a result, if Croft had reason to believe that Powell would be interested in the position, the Carmichael exception applies because of the "duty to consider . . . all employees who might reasonably be interested in the position." Id. at 1134.

The district court decided that Chief Croft did not have any reason to believe that Powell might be interested in the "promotion" because it would not actually have been a promotion for him. The court reached that conclusion because both the Battalion Chief and Assistant Chief reported directly to the Chief. It found that there was "no evidence [the defendants] knew of [Powell's] desire to make what otherwise would have been a lateral move."

We have never exhaustively discussed what distinguishes a purely lateral transfer from a promotion, but we have explained that a job with "better working conditions" is considered a promotion even though it may not represent an immediate increase in pay. Id. at 1134–35. To Powell, the Assistant Chief

28

position would have represented a change from suppression duties to an administrative role and from shifts of 24-hours on, followed by 48-hours off  to a regular 8 a.m. to 5 p.m. work schedule, which would mean that Powell would have been on duty 800 fewer hours a year.  Given that, Chief Croft had reason to believe that Powell could have considered the Assistant Chief's position a promotion and might reasonably have been interested in applying for it (as Powell insists he would have been).

And we cannot say that the Assistant Chief position is not above that of Battalion Chief in the department hierarchy.  Both do report directly to the Chief.  But the supervisor to whom a person reports is not the only fact that determines position in the employment hierarchy.

In this case, Chief Croft created the Assistant Chief position in part so that there would be someone in a permanent position to act on his behalf and oversee the fire department when he was absent.  Because Connell got the Assistant Chief position, Powell would have to report to him when Chief Croft was not there.  Meaning that, on those occasions, Connell would be Powell's direct supervisor, instead of the other way around if Powell had been selected.

We've recognized that a lateral transfer can be a demotion if it involves a "reduction in . . . prestige or responsibility."  Hinson v. Clinch Cty., Ga. Bd. Of Educ., 231 F.3d 821, 829 (11th Cir. 2000); see also Forsyth v. City of Dallas, 91

29

F.3d 769, 774 (5th Cir. 1996) (concluding that a lateral transfer to a position that was less prestigious, with less favorable working hours, and less interesting work was a demotion). The flipside is that a lateral transfer can be a promotion if it involves an increase in prestige or responsibility. See Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003) (concluding that "a position with substantially greater supervisory authority" is a promotion even if it otherwise would be a lateral transfer in the employer's hierarchy).

The only reason the defendants give for not considering Powell for the Assistant Chief position is that he did not express any interest in it. But according to our Carmichael decision, that is not a "legitimate" reason when a position is filled through informal procedures, and the plaintiff had no notice or opportunity to apply for the position. 738 F.2d at 1133–34. The defendants do not offer any other reason to explain why Powell was not considered and selected over Connell, who had 10 years less experience and was at lower rank in the department at the time. So we are left with Powell's prima facie case, and the unrebutted presumption of discrimination that comes with it. As a result, the district court erred in granting summary judgment to the defendants on Powell's failure to promote claim with respect to the Assistant Chief position.[10]

---

[10] The parties dispute whether the defendants waived their statute of limitations defense to all of the claims. The defendants point to a footnote in their motion for summary judgment which they argue raised the statute of limitations issue at least as to some of Powell's claims. But that footnote is only a footnote, and it never mentions Powell or asserts that any of the events

### b. *Johnson*

Johnson contends that he was denied an opportunity to be promoted to Fire Inspector after Colson was transferred back to suppression in November 2011. The Fire Inspector position was never posted and was given to Tommy Benton, who is white.

The defendants make the same argument as to Johnson that they did about Powell, asserting that Johnson failed to make out a prima facie case because he never expressed an interest in the Fire Inspector position. But because the position was unposted, Johnson need only show that the defendants had reason to believe he would be interested in that position and that he had no notice that it was available or no opportunity to apply. See id. at 1132–33. Johnson's twenty-six year tenure in the department, along with his recent application for the open Captain position earlier that same year, is reason enough for the defendants to have known that he would be interested. See id. (concluding that the employer had a reason to consider the plaintiff for a promotion when he had expressed a desire for

---

involving him are outside the statute of limitations. So the defense is waived as to that claim. Juris, 685 F.3d at 1325; In re Pan Am. World Airways, Inc., Maternity Leave Practices & Flight Attendant Weight Program Litig., 905 F.2d 1457, 1462 (11th Cir. 1990) ("[I]f a party hopes to preserve a claim, argument, theory, or defense for appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it."); United States v. Ramirez-Flores, 743 F.3d 816, 821 (11th Cir. 2014) (to preserve an issue for appeal a party "must raise that point in such clear and simple language that the trial court may not misunderstand it.") (quotation marks omitted).

similar promotions in the past). And it is undisputed that they did not consider Johnson for the position.

Even though the position was not posted, the defendants argue that the Carmichael exception is inapplicable because Johnson would have been aware that the Fire Inspector position was open after Colson was transferred back to suppression. But the only evidence in the record on that point shows that the Fire Inspector position was filled quickly, and Johnson's uncontradicted testimony is that he did not know it was available until the announcement that Benton had been selected for it. When Johnson complained about the position being filled without being posted, he received a memo from HR stating that Benton had been selected as Fire Inspector "to fill an immediate need for the work that needs to be done while, at the same time, accommodating the uncertainties of his existing medical condition."[11] Because the Fire Inspector position was filled quickly and without notice of its availability, Johnson would not have had any way of knowing that it was available.

The only remaining question about Johnson's prima facie case is whether he was at least as qualified for the position as Benton, who is white. See Combs, 106 F.3d at 1539 n.11. Johnson asserts that he was at least as qualified (or even more

---

[11] The defendants did not proffer the immediate need to fill the Fire Inspector position or the need to accommodate Benton's medical condition as a legitimate nondiscriminatory reason for filling it with him instead of Johnson.

32

qualified) for the position of Fire Inspector as Benton. He points out that Benton was suffering from dementia in the form of early onset Alzheimer's disease when he was named Fire Inspector.  The defendants insist that there is no evidence that Benton had been diagnosed with Alzheimer's when he was promoted or that his condition prevented him from adequately performing the job (besides needing to be driven around by Connell).  But Chief Croft admitted in his deposition that, even if he did not know that Benton had early onset Alzheimer's when Benton was promoted to Fire Inspector, he knew at the time that Benton had some "medical issues" that were "mental."  And, in any event, it is undisputed that Benton was not more qualified than Johnson was for the Fire Inspector position.

So Johnson has made out a prima facie case of failure to promote him to the Fire Inspector position.  The sole nondiscriminatory reason that the defendants proffered is that Johnson never expressed an interest in that position, which, as we have explained, the Carmichael exception excuses under these circumstances.  738 F.2d at 1132–34.  Like Powell's claim regarding the Assistant Chief position, Johnson's prima facie case is unrebutted.  As a result, summary judgment should not have been granted to the defendants on Johnson's discriminatory failure to promote claims as to the Fire Inspector position.

## B.  DISPARATE TREATMENT IN TRAINING

33

Four of the plaintiffs, Colson, Bradshaw, Johnson, and Powell, raise disparate treatment claims, asserting that the defendants discriminated against them on racial grounds by denying them the opportunity to complete their training as arson investigators while allowing white firefighters to do so. In order to establish a prima facie case of disparate treatment, a plaintiff must establish that (1) he belongs to a protected class; (2) he suffered an adverse effect on his employment; (3) his employer treated similarly situated people outside of the protected class more favorably; and (4) he was qualified for the benefit sought. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).

None of the plaintiffs can make out a prima facie case of disparate treatment. Colson and Bradshaw had not completed ten fire investigations, which was required before they could take the course that would complete their training. So they were not qualified to take that course, which was the second part of training. Johnson never expressed a desire to take the course. And even if Powell had taken the course, he would not have been able to be an arson investigator because, as a Battalion Chief, it would have created a conflict of interest — he would have been investigating fires that he had helped put out. So being denied that training opportunity did not amount to, or result in, any adverse effect on his employment. See Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (explaining that an adverse employment action is "conduct that alters an

34

employee's compensation, terms, conditions, or privileges of employment")
(emphasis added) (quotation marks omitted).  The defendants were, as the district
court concluded, entitled to summary judgment on the plaintiffs' disparate
treatment claims.[12]

## C. RETALIATION

Colson and Bradshaw contend that the defendants are not entitled to
summary judgment on the retaliation claims.  To make out a prima facie case of
retaliation, Colson and Bradshaw must establish that they engaged in protected
activity, suffered a materially adverse action, and that there was some causal link
between the two events.  Dixon v. Hallmark Cos., 627 F.3d 849, 856 (11th Cir.
2010).

Both Colson and Bradshaw argue that they were reassigned from Fire
Inspector and Life Safety Educator to suppression duties in retaliation for filing
their initial EEOC charges.[13]  There is no dispute that the two of them  engaged in

---

[12] The plaintiffs contend that the fire department was operated in a way that deprived
every black firefighter equal opportunity for advancement.  They argue that they have presented
a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional
discrimination" by the fire department against every black firefighter.  Smith v. Lockheed-Martin
Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  We disagree.  Whether the evidence is considered
individually or collectively, it does not raise a reasonable inference of discriminatory intent with
respect to the plaintiffs' disparate treatment claims.  Nor does it raise a reasonable inference of
discriminatory intent with respect to the plaintiffs' failure to promote claims — with the
exceptions of Johnson's claim about the Fire Inspector position and Powell's claim about the
Assistant Chief Position.  See id.

[13] Colson also contends that the 2011 GBI investigation into the missing recycling
proceeds was also done in retaliation for his EEOC charge.  He argues that Chief Croft accused
him of stealing the money meant for the Burn Foundation and called the police.  But that string

protected activity when they filed their initial EEOC charges, and reassigning them to suppression was a materially adverse action.[14]

The district court still concluded that Colson and Bradshaw did not make out a prima facie case because there was no causal connection between their initial EEOC charges and their reassignments. Causation can be shown by a close temporal proximity between the statutorily protected activity and the adverse action. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). But without more, the activity and adverse action must be "very close" in time to create a genuine issue of causation. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001).

The district court determined, and the defendants argue, that the 82 days between Colson's and Bradshaw's August 25, 2011 EEOC charges and their reassignment to suppression on November 14, 2011 of that same year is too much

of events began when the Burn Foundation asked about the lack of donations from the fire department in recent years. One of Colson's duties was to manage that charitable program for the department, and the Burn Foundation inquired, stating that it had not received the donations. It was the Burn Foundation's actions that led to the investigation of Colson, not his EEOC charge.

[14] The district court only assumed without deciding that Colson and Bradshaw's reassignment to suppression was a materially adverse action. Even though the positions were paid about the same amount annually, the transfers came with a change from regular 8 a.m. to 5 p.m. days to less desirable 24-hour on, 48-hour off shifts and a decrease in their hourly wage. They had to work 800 hours more a year to make the same amount of money. A change to a less desirable shift with an increase in working hours is materially adverse. See Burlington N. & Santa Fe Ry. Co. v. White, 126 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (explaining that a materially adverse action is anything that might dissuade "a reasonable worker from making or supporting a charge of discrimination").

36

time for an inference of retaliation.  Maybe. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not [close] enough.").  But the picture is clouded some by evidence indicating that the actual decision to reassign Colson and Bradshaw did not happen in November but instead shortly after their meeting with Chief Croft on September 30.  That would reduce the time distance between the protected conduct and the adverse action from 82 days to 37 days.

A strong argument can be made that where the decision to take adverse action occurs on a different date than the taking of the action, what counts is the proximity of the protected activity to the decision to take adverse action, not the proximity of the protected activity and the action.  See Breeden, 532 U.S. at 272, 121 S. Ct. at 1511; Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").  If so, the lack of temporal proximity between protected conduct and adverse action will not defeat a plaintiff's prima facie case if the defendant decided to take the adverse action soon after the protected conduct but did not actually take it until later.

37

We need not base our decision on that idea or decide the temporal proximity and causation issues here but can instead assume that the plaintiffs Colson and Bradshaw have made out a prima facie case of retaliation. Our assumption does not matter because the defendants have proffered a nondiscriminatory reason for the transfers that has not been shown to be pretextual.

The defendants assert that the reason Chief Croft reassigned Colson and Bradshaw was because of their poor performance. Even before they filed their first EEOC charges on August 25, Croft was concerned about Colson and Bradshaw's performance. He had learned at the June 15 meeting that they were not properly doing hazardous materials and commercial building inspections. He also learned that they were not properly entering records of the inspections they did do into the department's computer system. Those concerns were the subject of the September 30 meeting. And that meeting led to Colson and Bradshaw's reassignment to suppression on November 14. Unsatisfactory job performance is a legitimate nondiscriminatory reason that will rebut a prima facie case. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

Legitimate, nondiscriminatory reasons for the transfers having been proffered, it was up to Colson and Bradshaw to provide sufficient evidence for a reasonable factfinder to infer that those reasons were pretextual. See Crawford, 529 F.3d at 976. To do that, Colson and Bradshaw had to demonstrate "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Alvarez v. Royal Atl. Developers, Inc.</u>, 610 F.3d 1253, 1265 (11th Cir. 2010) (quotation marks omitted).

Colson and Bradshaw do not dispute that they were behind on inspections and that they had failed to properly enter the inspections they did make into the computer system. Instead, they argue that they were never reprimanded for deficient performance before they filed their EEOC charges. But to the extent a reprimand was required, what happened at their June 15 meeting with Chief Colson amounted to a verbal reprimand, or at least a warning. As Colson and Bradshaw state in their August 25 EEOC charges, at the June 15 meeting they were told that they "need[ed] to improve [their] performance."

Colson argues that the defendants' assertions about his poor performance are a pretext for racial discrimination and that replacing him as Fire Inspector with Tommy Benton, who is white and had early onset Alzheimer's disease, shows that. As we have mentioned before, when Benton was chosen as Fire Inspector, the defendants did not know that he had Alzheimer's. But whatever the defendants knew or should have known about Benton's mental condition at the time he was selected to replace Colson does not rebut their proffered reasons for removing Colson from that position. The undisputed evidence shows that Chief Croft

warned Colson about what he viewed as poor performance before Colson made an

EEOC charge. Given the undisputed evidence of Colson's performance problems,

the fact of Benton's health problems at the time he was chosen to fill the Fire

Inspector position is not enough to create a genuine issue of material fact that the

defendants' legitimate, nondiscriminatory reason for reassigning Colson is

pretextual. It is, after all, the removal of Colson from the position, not the failure to

select him instead of someone else to the position after he was removed, that is at

issue.

No evidence Colson and Bradshaw point to casts doubt on the reasons that

the defendants gave for removing them from the positions in which they were not

properly performing. They are "quarreling with the wisdom" of the defendants'

decision, but that is not enough to create a genuine issue of material fact about

pretext. Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

The defendants are entitled to summary judgment on Colson and Bradshaw's

retaliation claims. See Crawford, 529 F.3d at 976; see also Thomas, 506 F.3d at

1364 ("We may affirm the district court's judgment on any ground that appears in

the record, whether or not that ground was relied upon or even considered by the

court below.").

## D. DISPARATE PAY

40

All five plaintiffs contend that the district court erred in granting summary judgment against them on their claims of wage discrimination. To establish a prima facie case on that type of claim, a plaintiff must show that he was paid less than a similarly situated member of a different race and that he was qualified to receive the higher wage. See Cooper v. Southern Co., 390 F.3d 695, 734–35 (11th Cir. 2004), overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195 (2006). A plaintiff and the comparator he identifies must be similarly situated in all relevant respects. Holifield, 115 F.3d at 1562.[15] If the plaintiff cannot show that there is a similarly situated employee, then the defendants are entitled to summary judgment "where no other evidence of discrimination is present." Id. (emphasis omitted). That's the case here.

Powell does not offer any comparators at all. He simply says that he was discriminated against because, out of the 23 employees in the City at Powell's pay grade, only he and one other were black. But he does not provide any evidence that he was discriminated against in his pay based on his race. The district court

---

[15] In Lewis v. Union City, No. 15-11362, this Court has granted en banc rehearing to decide how similar comparators must be. The parties in that case have been asked to brief: "What standard does the phrase 'similarly situated' impose on the plaintiff: (1) 'same or similar,' (2) 'nearly identical,' or (3) some other standard?" However the Court answers that question, it will not change the fate of the disparate pay claims in this case because under any reasonable standard, the plaintiffs have not identified any appropriate comparators.

properly entered summary judgment against Powell on his disparate pay claim. See id.

The other four plaintiffs, Colson, Bradshaw, Johnson, and Smith, all offer several other white firefighters as comparators. To do that they rely mainly on a spreadsheet that lists the name, job title, paygrade, salary, race, sex, and hire date for all of the firefighters in the department over a five year period, from 2010 to 2014. All of the comparators were hired at the same time or at some point after each of the plaintiffs were. The gist of their argument is that those white firefighters had not served in the department as long as they had but were paid more for the same work.

But length of service in the department alone is not the only proper measure for determining pay. See Cooper, 390 F.3d at 745 (explaining that the plaintiff's disparate pay claims failed because she did not show that her proposed comparators had similar levels of experience, education, or responsibility, but instead relied on the conclusory assertion that they were "lower" employees). And the plaintiffs have not provided any other information besides that on the spreadsheet. For example, there is nothing showing that the comparators had similar levels of experience in their careers or similar levels of education or similar job responsibilities. See id.

42

If anything, the spreadsheet appears to show that their chosen comparators routinely were higher ranked or had more experience or had other certifications that justify disparity in pay.  For example, two of the plaintiffs, Smith and Johnson, point to Mark Sealy as a comparator.  Sealy was a Captain and was promoted to Battalion Chief during the five-year period at issue, while Smith was a driver-engineer and Johnson was a lieutenant during that time.  So the proffered comparator did not hold the same rank as those two plaintiffs did, and there is no showing that he did not achieve that higher rank based on a competitive test or other non-discriminatory criterion.

Others offered as comparators had previous experience that justified a higher starting salary.  For example, Jonathan Paschall, whom Colson relies on as a comparator, was hired at a higher starting salary than Colson because of Paschall's "previous experience as [a] driver" with an EMS agency.  The pay records also show that the department gave financial incentives for completing certain certifications.  For example, a hazmat certification resulted in an extra 62 cents an hour, and an EMT certification resulted in a five percent increase in pay.  The plaintiffs do not show that they had similar certifications, or that the relevant comparators' pay would have been higher even without the certifications.  And because annual merit raises were based on a percentage of the firefighter's pay,

43

pay disparities caused by legitimate, non-discriminatory factors would be increased over time.

Because they have not identified any similarly situated comparators and have failed to present other evidence sufficient to create an inference of discrimination, their claims of racially discriminatory pay disparity fail.  See id.

## V.  CONCLUSION

We **REVERSE** the district court's judgment on Powell's claim of racially discriminatory failure to promote him to the rank of Assistant Chief and on Johnson's claim of racially discriminatory failure to promote him to the Fire Inspector position.  We **AFFIRM** the district court's judgment on all of the plaintiffs' other claims.  And we **REMAND** the case to the district court for further proceedings consistent with this opinion.